UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

STEPHANIE GRIMES,

Plaintiff,

- v –

NEW YORK PRESBYTERIAN HOSPITAL, MARY BETH
CLAUS, TAMARA RUDICH, IRENE LOUH, SUSAN KARP,
NAYISHA LUQUIS, AND RUKIYA MCFADDEN

Defendants,

Case No. _____

**VERIFIED COMPLAINT
WITH JURY DEMAND**

---

TO THE UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF NEW YORK,

Plaintiff, STEPHANIE GRIMES ("Grimes" or "Plaintiff") through her attorney, Vincent

Miletti, Esq., with the Law Office of Vincent Miletti, Esq., respectfully complains against

defendants, NEW YORK PRESBYTERIAN HOSPITAL, ("NYPH"), MARY BETH CLAUS

("Claus"), TAMARA RUDICH ("Rudich"), IRENE LOUH ("Louh"), SUSAN KARP ("Karp"),

NAYISHA LUQUIS ("Luquis"), and RUKIYA MCFADDEN ("McFadden") (collectively,

"Defendants") as follows:

## NATURE OF THE ACTION

1.      This is an action arising under Title VII of the Civil Rights Act of 1964 ("Title

VII"), the Americans With Disabilities Act ("ADA"), the Age Discrimination in Employment Act

("ADEA"), as amended, 42 U.S.C. § 2000e et seq., the New York State Human Rights Law, N.Y.

Exec. Law §290, et seq. ("NYSHRL"), the New York City Human Rights Law, N.Y. Admin. Code

§8-101, et seq. ("NYAC"), and state common law seeking declaratory and injunctive relief, and

damages to redress the harms and losses that Plaintiff suffered because of unlawful workplace

practices, perpetrated and ratified by defendants, predicated on their unlawful discriminatory

conduct, which discriminated against plaintiff based on her age, disability, perceived disabilities,

closely held religious beliefs and practices, and violation of her medical privacy, which was only exacerbated once they engaged in invidious retaliation for her opposition to the defendants' unlawful, discriminatory conduct.

## **PARTIES**

2.      Plaintiff, Stephanie Grimes, is an individual residing in the State of New York and can be reached through her attorney, Vincent Miletti, Esq., located at 2139 East 3rd Street, Brooklyn, New York 11223.

3.      Defendant New York Presbyterian Hospital is a corporation with substantial operations in the State of New York doing business at 525 East 68th Street, New York, New York 10065.

4.      Upon information and belief, defendant Ms. Mary Beth Claus is an individual residing in the State of New York. She is sued in her individual capacity and official capacity as Group Senior Vice President, Chief Legal Officer and General Counsel at NYPH.

5.      Upon information and belief, defendant Ms. Tamara Rudich is an individual residing in the State of Connecticut but working in the state of New York. She is sued in her individual capacity and official capacity as the Director of Analytics at NYPH.

6.      Upon information and belief, defendant Ms. Irene Louh, MD, PhD is an individual residing in the State of New York. She is sued in her individual capacity and official capacity as an Associate Chief Medical Officer, Vice President of Analytics at NYPH.

7.      Upon information and belief, defendant Ms. Susan Karp is an individual residing in the State of New York. She is sued in her individual capacity and official capacity as a Human Resources Business Partner at NYPH.

8.      Upon information and belief, defendant Ms. Nayisha Luquis is an individual residing in the State of New York. She is sued in her individual capacity and official capacity as a Human Resources Business Partner at NYPH.

9.      Upon information and belief, defendant Ms. Rukiya McFadden is an individual residing in the State of New York. She is sued in her individual capacity and official capacity as a Human Resources Business Partner at NYPH.

## JURISDICTION & VENUE

10.     This Court has original jurisdiction based on 42 U.S.C § 2000e-5(t)(3), and 28 U.S.C §§ 1331 and supplemental jurisdiction over the Plaintiff's NYSHRL and NYAC state law claims under 28 U.S.C. § 1367.

11.     Venue is proper in this district pursuant to 20 U.S.C. §139l(b) because Defendants are located in this judicial district and a substantial part of the events, including but not limited to the decision making process, which give rise to the claims herein occurred in this district.

12.     Plaintiff filed a timely charge of employment discrimination with the New York State Department of Human Rights ("NYSDHR") on or around January 8, 2022. Shortly after its submission, the NYSDHR provided the plaintiff with a Notice of Right to Sue.  Upon submission to the NYSDHR, we indicated that we desired to duly file with the Equal Employment Opportunity Commission ("EEOC").

13.     On or about January 25, 2023, the Plaintiff received the EEOC Determination and Notice of Right to Sue ("RTS").  The RTS was dated January 11, 2023, and the envelope was post marked on January 18, 2023. See ***EXHIBIT A*** for the EEOC's RTS.

14.     Plaintiff has satisfied all administrative prerequisites and is filing this case within ninety (90) days of receiving the EEOC's Right to Sue Letter.

## STATEMENT OF FACTS

15.     Plaintiff began working for the Defendant in April 2002 as a Quality Management Specialist, commanding a 6-figure salary with annual bonuses from 2% - 4%.  Ms. Grimes directly reported to Ms. Tamara Rudich, Director of Analytics and Ms. Irene Louh, MD.

16.     Since such commencement and throughout the course of her employment, the plaintiff had a stellar career and enjoyed substantial success with NYPH.  Prior to her wrongful termination, she was a hard-working and dedicated employee who maintained an unblemished performance record.  She earned a significant salary, that was achieved through her diligent work ethic for over 20 years. Ms. Grimes's performance reviews confirm that she  "met" or "exceeded expectations" and she received bonuses throughout her tenure.

17.     Notably, Ms. Grimes was one of the first individuals in her department to work from home and had been doing so for approximately the last 15 years, with the exception of her attendance at a monthly meeting. By the time of her wrongful termination, her position had ultimately evolved into one that was fully remote (due to the COVID-19 pandemic) and she had not been on campus for approximately 2 years prior to her wrongful termination.

18.     Unfortunately, shortly after the defendants shifted their business model from one that was typical of hospital systems prior to the pandemic, to a more schizophrenic business model, one that changes every single day in light of the COVID-19 pandemic, she became the target of severe, unrelenting harassment and discrimination perpetrated by her coworkers and superiors on account of her disabilities, perceived disabilities, closely held religious beliefs, and interest in maintaining her medical privacy.

   **a.  Underlying Autoimmune Conditions.**

19.     Plaintiff suffers from psoriasis and other autoimmune conditions which cause significant fatigue, joint pain, recurring fevers, rashes, and other issues ("Autoimmune Conditions").

20.     Plaintiff's Autoimmune Conditions predate the pandemic and predate her wrongful termination.

21.     Plaintiff has been suffering from her Autoimmune Conditions her entire adult life.

22.     While Plaintiff always suffered from her Autoimmune Conditions, it was never an issue as Plaintiff worked remotely for approximately 15 years.  Plaintiff had no need to disclose her  private medical information until September 2021, since she was always able to perform her job functions without issue and without any detriment due to her remote work situation.

**b.  Underlying Closely Held Religious Beliefs.**

23.     Plaintiff is an observant member of the Roman Catholic church.

24.     In accordance with her strong and sincerely held religious beliefs, the Plaintiff attends weekly Mass every Sunday, engages in daily prayer in the home with her family, follows the teachings of the Catholic Church, written in the Gospel and the Catechism, has a strong relationship with her local pastor and religious leaders, and most importantly, embraces and maintains her strong personal relationship with the Lord, Jesus Christ.

25.     Plaintiff's strict religious observance predates the pandemic and predates her wrongful termination.

26.     While Plaintiff had continuously participated in her strict religious observances, and her bona fide religious beliefs, there was never an instance in which any of her religious beliefs conflicted with work as Plaintiff worked remotely for approximately 15 years.  If there was a holyday of observation, it wasn't an issue as she would just log out and resume when the holyday was over. If there was a specific agenda or course of business that NYPH wanted to engage in, that

conflicted with her personal beliefs or wellbeing, she would simply ignore and not participate. This was never an issue prior, which is made apparent by her 20-year stellar record.

27.     The defendants were well-aware of her religious practices and beliefs.  This is no surprise.

**c.  Enter The Pandemic & NYPH's Poor Policy Guidelines and Protocol**

28.     At some point in July 2021, NYPH began to attempt to implement pandemic protocol mandating the Covid 19 vaccine. Plaintiff requested an exemption based on two key points. The first exemption sought by the plaintiff was based on the religious exemption ("RE"), wherein she asserted her deeply held religious beliefs which conflicted with receiving a vaccine. Based upon the records, she was told to upload her request to the Company based system software ("VaxApp"), which she did on or about July 29, 2020.  See ***Exhibit B.***

29.     Plaintiff's RE was approved on or about August 22, 2021. See ***Exhibit C.***

30.     On August 30, 2021, Plaintiff inquired about a Medical Exemption ("ME").  As stated, the Plaintiff suffered from a variety of Autoimmune Conditions which create a dangerous risk for her health if she were to receive a vaccine.  Specifically, according to her doctors' recommendations, in a letter dated on September 15, 2021[1], as a result of her Autoimmune Conditions, it will result in a severe adverse reaction in the event that the COVID-19 vaccination would be administered to her.

31.     During this time, Plaintiff's director, Ms. Rudich constantly inquired about Plaintiff's vaccine status and her ability to get vaccinated.  At no time was the Plaintiff unable to perform her job functions, at no time was there ever a risk or a direct threat to anyone due to her medical issues, and at no time were those inquiries by Ms. Rudich consistent with business necessity.  Plaintiff consistently responded by saying she was exempt and did not desire to be

---

[1] We will make medical information available once a protective order is entered into between the parties.

vaccinated due to both religious reasons and medical reasons. Mr. Rudich was particularly aggressive with the improper disability-related inquiries, as she continued to contact Plaintiff even in off hours and when Plaintiff was on vacation.

32.     The Plaintiff's ME was not submitted for review at the time because she had received an approval for her RE from NYPH, and she was advised that there was no need to submit it.

33.     Notably, if Plaintiff wanted to submit the ME, she would have been precluded from doing so. As evidenced in the screenshots below, there was no ability to even select a medically based exemption on the VaxApp.



*(Screenshot of VaxApp, With No Ability to Select An Exemption After Plaintiff Submitted Her RE)*

34.     On August 30, 2021, Ms. Grimes was informed by NYPH that the New York State Department of Health "made the determination to exclude religious exemptions" and as such, Ms. Susan Karp, Human Resources Business Manager, informed Plaintiff that this may lead to a rescission of her religious exemption.

35.     On August 30, 2021, Ms. Karp also advised the Plaintiff that it was "too late" to submit her medical exemption.

36.     This confused the Plaintiff since (a) emails from the Defendants, dated the same day, August 30, 2021, very clearly stated that the deadline to receive the first dose of the vaccine or have an approved medical exemption was **September 15, 2021**, (b) that now she is being told to not pay attention to the email she is reading, and that there is no ability to submit a medical exemption, and (c) they left her in extreme anxiety and uncertainty because all of a sudden, they are taking the position that her closely held religious beliefs are now in conflict with her work when this was never an issue for the past 20 years of employment.

37.     As stated above, the Plaintiff was unable to upload her medical exemption into VaxApp because the system no longer accepted medical exemption documentation, which is in stark contrast to what was previously communicated by NYPH.

38.     In an email from Defendants dated September 14, 2021, the Plaintiff was told that: (a) Employees who do not comply with the vaccination program by the deadline will be placed off duty for 7 days without pay and locked out of NYP systems (except email and VaxApp – so they are able to still work by way of email, **but now they can do so without pay**!), (b) they will need to show proof of vaccination by September 23, 2021, (c) employees who are on an approved leave of absence as of the cutoff date are excluded from the lockout process, (d) that the New York State Department of Health (DOH) regulation on vaccine programs required us to remove the option for a religious exemption from the COVID-19 vaccination program (which is not true), (e) that they were **putting the vaccination process on hold for anyone who was approved for a religious exemption, and that for employees who met the original deadlines for the religious exemption, they would have to continue following the COVID-19 protocols in place**.  See email dated September 14, 2021, ***Exhibit D***.

39.     Notably, there was nothing in this email dated September 14, 2021 that authorized the Defendants to ignore the Plaintiff's previously granted exemptions and exempt status, so the

communications from the Human Resources Team was purely meant to intimidate and pressure the Plaintiff to ignore her medical condition and closely held religious beliefs.

40.     What is also critical to understand here is that <u>there was no such requirement to remove the option for a religious exemption as it concerned the COVID-19 vaccine</u>.

41.     On September 22, 2021, just one week after this email communication, the City provided clarification as to the vaccine requirement, codified at 10 NYCRR §2.61 ("Section §2.61"). According to the City and according to the case law, the City states that <u>Section §2.61 does not prohibit a covered entity from offering an accommodation to an employee so long as the employee does not "engage in activities such that if they were infected with COVID-19, they could potentially expose other covered personnel, patients or residents to the disease."</u> *10 N.Y.C.R.R. § 2.61(a)(1)*. See *Dr. A. v. Hochul, et al., Def. Memorandum, PACER Doc. No. 50, filed on September 22, 2021, page 22*. Attached is a copy of the relevant pages of the memorandum at ***Exhibit E.***

42.     In other words, so long as the employee does not engage in activities, such that if they were infected with COVID-19, they could potentially expose other covered personnel, patients or residents, then the exemption would be acceptable.

43.     Immediately after the September 22, 2021 publication, and prior to the unlawful, unjust and wrongful termination of Plaintiff, the DOH stated very clearly in their **November 15, 2021** correspondence that the <u>Defendants should have a process in place to consider reasonable accommodation requests from covered personnel based on sincerely held religious beliefs consistent with applicable Federal and State laws, including Equal Employment Opportunity (EEO) laws such as Title VII of the Civil Rights Act and NYS Human Rights Law, and their applicable guidance</u>. See ***Exhibit F***.

44.     The notion that Section §2.61 entitled employers to reject religious and medical exemptions is not true and not reflected in the law.

45.     Based on the City's defense on September 22, 2021, in which they say that *10 N.Y.C.R.R.* §2.61 does not prohibit a covered entity from offering an accommodation to an employee, how do you reconcile the fact that *10 N.Y.C.R.R. § 2.61* permits a reasonable accommodation for Title VII, which is the original basis of the religious exemption, but for some reason, some how, the employer is no longer permitted to consider a religious exemption pursuant to *10 N.Y.C.R.R. § 2.61*? This makes no sense.

46.     In fact, even now at the time of filing this Complaint, the most recent published vaccine mandate in New York City states, "this Private Sector workplace requirement does not apply to people who have requested reasonable accommodations for medical or religious reasons. If a worker is granted a reasonable accommodation, businesses must record the basis for the accommodation and keep supporting documentation in accordance with the below guidance. See ***Exhibit G,*** which has remained consistent from the NYC Commission on Human Rights, dated December 15, 2021.

47.     As the September 15, 2021, deadline came and went, no one discussed any options with the Plaintiff.  She continued to work in her stellar fashion, on a remote only basis, without any issues and without any barriers.  Certainly, there was no hardship on the Defendants under this working situation. Simply put, Plaintiff continued working in her position, which had no exposure to other personnel, patients, or residents of NYPH.

48.     On or about October 21, 2021, Plaintiff received an email advising that NYPH was beginning to implement their non-vaccinated weekly testing.

49.     Plaintiff had her first test on October 29, 2021, and reported that it was unbelievably painful due to it being administered very aggressively by Ms. Anna Iorio, a Nurse Practitioner at Occupational Health and Safety at NYPH – Westchester campus.

50.     Plaintiff reported this unnecessarily aggressive and physically harmful act by Ms. Iorio to her supervisor, Ms. Tamara Rudich, Director of Analytics, the only response received was (a) thanks for letting us know, (b) Plaintiff was reminded that her continued employment was contingent on compliance (never mind the aggressive, unprofessional and painful treatment rendered by Ms. Anna Iorio) and (c) she should find a testing site that suits her needs. While Ms. Iorio should be disciplined as to her unprofessional and excessively aggressive treatment of employee patients, we suspect this is done intentionally, because of Plaintiff's legal and lawful opposition to the vaccination.

51.     In a very unexpected turn of events, on October 29, 2021, **the Plaintiff discovered that the position she was then employed in, as a Quality Management Specialist, was posted as an available position on NYPH's intranet**. This startled her as she couldn't understand why her position was being posted. There was no need for a posting of her position, as she was currently performing the work in her usual stellar fashion, but she didn't want to inquire  internally for risk of being further retaliated against for her lawful and legal opposition to the vaccination, so she ignored this to her detriment and continued to perform her daily tasks.

52.     Plaintiff continued to comply with weekly covid testing despite the fact that she was a fully remote employee with zero patient and employee contact. The testing was unnecessary and uncomfortable, but Plaintiff underwent testing from CVS Pharmacy on November 3, 2021, November 10, 2021, November 18, 2021, and November 26, 2021, and on each occasion, the COVID-19 results returned negative.

53.     On November 17, 2021, NYPH sent out a communication advising that (a) all covered staff were to receive their first dose of the vaccine by Monday, November 22, 2021, (b) that the state mandate no longer permitted religious exemptions (which was not true), and (c) employees may wish to seek counsel from their respective religious leaders.

54.     This confused the Plaintiff as (i) she already qualified for her religious exemption, (ii) is still compliant with the law, as she has received proper and legal exemptions, and the most recent **DOH guidance just prior to the November 17, 2021 communication, dated November 15, 2021, was supportive of sincerely held religious beliefs**, (iii) she was currently undergoing the weekly testing program, albeit painful and uncomfortable, and (iv) she held a position that was entirely remote, with no exposure to other personnel, patients or residents of NYPH.  Certainly, considering her position was not one where she "interacted with other staff or patients," she would not be detrimentally impacted.

55.     On November 22, 2021, NYPH sent an email notifying employees that (a) they would consider reasonable accommodation request based on sincerely held religious beliefs, (b) that unvaccinated individuals were not permitted to continue in positions where they interact with staff or patients, and (c) they may be able to offer an accommodation based on the employee's position.

56.     However, as a result of the inconsistent and confusing messages, Plaintiff followed up with NYPH to inquire about her existing application and religious exemption approved status. Based on the NYPH email dated November 22, 2021, on November 24, 2021, the Plaintiff desired a review of her status.  Plaintiff felt comfortable since (a) she was granted her religious exemption back in August, (b) she has been remote for over 15 years, and (c) she has no physical contact with other staff or patients. Considering nothing changed after the November 22, 2021 email, and her position did not require her to be on campus, and as such, there should be no concerns.

57.     On November 24, 2021, Ms. Nayisha Luquis responded to the Plaintiff and advised that she would be working with the leadership team to understand the potential accommodation over the next 24-48 hours. See ***Exhibit H***.

58.     On or about November 26, 2021, during the Thanksgiving Holiday in which NYPH is closed, Plaintiff received a follow up email from Ms. Luquis, rescinding her religious exemption approval status and saying she was not qualified for religious exemption status. Ms. Luquis advised: (a) Plaintiff was required to participate in your role on-site (*which she was not for the last 15 years*), (b) Plaintiff was in contact with patients and staff while on-site (*which she was not for the last 15 years*), and (c) there is no such accommodation that would not create a financial and/or operational hardship for the Hospital (*meanwhile for the past 15 years, she worked remotely just fine, without creating a financial or operational hardship*).  See ***Exhibit I.***

59.     Plaintiff immediately followed up inquiring as to the underlying reason for the adverse determination. She then also reminded NYPH of her existing application for a **medical exemption, which had been previously ignored**. Both exemptions are expressly authorized under the law and statute, were in compliance with all of the city and state directives, and she was entitled to a reasonable accommodation under each.

60.     Ms. Susan Karp, notifying Plaintiff's director, and responded by asking (a) if Ms. Grimes medical condition was either a "new" condition or long term, chronic, condition; (b) if the medical condition developed after August 6 (suggesting Plaintiff is not being truthful) and (c) reiterated in her request the firm deadline of August 6, 2021, at which time there should be no more applications submitted for a medical exemption.

61.     Plaintiff was taken aback by the informal and overbroad disability-related inquiry, and responded that she was uncomfortable disclosing any additional personal protected health information than what was already provided, especially in an email. Also note, how is there a

deadline for a medical exemption? If someone has a medical issue, does it magically expire after a certain day?

62.     Ms. Karp, looking to retract some of her commentary as it was clear her questioning amounted to a disability-related inquiry, advised that no information was shared (which was impossible based on the communications between the parties and the many other emails copied as additional correspondents), but continued to inquire during the email exchange.

63.     On November 30, 2021, Plaintiff sent one final email before being permanently removed from the Company server, specifically asking: (i)  if there was a firm August 6, 2021, deadline, then how is it possible that she is being asked for additional medical information at this time, (ii) that such information should not have been disclosed to anyone outside the approval process; (iii) that she was already granted a religious exemption from NYPH previously, and does not understand why it is suddenly rejected, when the November 22, 2021 email, as well as the law and local guidance, clearly indicated that this was permissible; (iv) that she was previously advised to NOT submit her medical exemption because the deadline had passed; (v) that she has no-on site role at NYPH, and has zero-contact (i.e. no proximity) with other employees and patients; and (vi) that she was not given any parameters or explanation about the process used to determine what hardship existed to the hospital underlying her rescission / rejection.  See ***Exhibit J***.

64.     Plaintiff's access to the system was immediately revoked in retaliation for her continued objection to the discriminatory, inconsistent and outright unlawful treatment she received based on both her Autoimmune Conditions and religious convictions.  She was also subjected to having her medical privacy breached, being asked improper questions as to the history of her medical condition, and having her private medical information disclosed to those who did not have a need to know, nor were to be involved in any aspect of the decision-making process.

65.     Of course, the moment it was discovered by the Plaintiff, and realized by NYPH, that confidential medical information was being exchanged between parties, and shared through the email, and the moment that it was realized that NYPH dropped the ball on the medical concerns, suddenly Ms. Rudich wanted to discuss it over the phone.  Because improperly denying the Plaintiff her rights to a religious accommodation and medical accommodation, outright ignoring her medical issues and concerns for 3 months, and improperly disclosing her confidential medical information to those who have no reason to know of such, is always safer for the employers to do so when there is no written record, so a phone call is appropriate.  See ***Exhibit K***.

66.     Just a few days after the restriction, and precisely as the Plaintiff predicted, during the course of the conversations and dialogue in this matter, in further retaliation, Plaintiff was wrongfully terminated on **November 30, 2021**, under the false and fictitious pretext that she "voluntarily resigned," and received this in writing on **December 2, 2021**.

67.     Ironically, Plaintiff first learned about her termination prior to receiving it in writing from NYPH after receiving numerous text messages from other employees, sending her text messages saying "Hi. I heard the news. I will miss you so much" or "I heard the news earlier today that you are no longer with NYP."

68.     At the time of the Plaintiffs unfair, unjust and unlawful termination, Plaintiff was replaced by Ms. Jeslyne Acosta, who at the time of the replacement, we believe was 39 years old. Plaintiff was also succeeded by Ms. Linda Georges, who we believe is approximately 33 years old. In both instances, the succeeding employees were younger than the plaintiff, giving rise to the inference that at least part of the decision to unlawfully, unjustly and wrongfully terminate the plaintiff was predicated on her age.

69.     Unfortunately, Plaintiff's pleas for an objective review of the religious exemption and medical exemption were ultimately, intentionally and systematically ignored.

70.     The true reason for her termination was that there is a pervasive culture fostered by NYPH which discriminates against people who are either medically unable to get the vaccination, or unable to get the vaccination based on their religious convictions.

71.     Even though both the City and the DOH have been very careful to say that for employees who have a closely held religious conviction or medical disability, they should be given a reasonable accommodation and that should be catalogued and considered, NYPH has not used any such care or precision.  They fail to train their staff and send an army of uninformed employees to handle such sensitive requests—and they engage in illegal and unlawful acts of retaliation, adverse treatment and other unjust actions.

72.     There is a prevailing notion that those who are unvaccinated are perceived as disabled.  That by nature of the employee being unvaccinated, they are a leper, and they are unfit to coexist with those around them.

73.     It is irrelevant what the employer calls its discriminatory practice, or even how others might label it.  By treating the Plaintiff in this matter, one with a true religious conviction and true medical disability, in such a disturbing fashion, where her concerns are dismissed so much that she can't even upload a piece of paper in the system to protect her job that she  performed in a stellar fashion for 20 years is atrocious.

74.     No matter what is going on here, the fact is Plaintiff is part of a class of people that are either medically unable to, or spiritually unable to, receive the vaccination.  They are perceived as sick, as hosts that are literally in the work force, just there to infect and harm others.  It doesn't matter if they are working remotely, it doesn't matter if they have no physical contact with the rest of society—they are treated as lepers, and their religious or medical concerns are disregarded by the Defendants.

75.     In light of the foregoing and the circumstances surrounding the unlawful, illegal and wrongful termination of the Plaintiff, it is abundantly clear that such termination was predicated on invidious discrimination based on her disabilities and religion, as well as an act of retaliation for her complaints about the ongoing discrimination and harassment she received while employed with NYPH.

## FIRST CAUSE OF ACTION
**Hostile Work Environment Based on Age, Creed (Religion) & Disability In Violation of New York State Human Rights Law, N.Y. Exec. Law § 290, *et seq.* Against all defendants**

76.      Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

77.     By the actions described above, Defendants subjected Plaintiff to a hostile work environment and inferior terms, conditions or privileges of employment on account of her age, creed (religion) and disability.

78.     Specifically, the workplace maintained by the Defendants was permeated with discriminatory intimidation and illegal tactics used to pressure the Plaintiff into submitting to an act that would have caused damage to her closely held religious convictions, caused harm to her existing medical condition, impinged on her medical privacy and bodily integrity, and engaged in a practice of ridicule and insult that was sufficiently severe and pervasive so as to alter the conditions of the Plaintiff's employment  creating a hostile and abusive working environment

79.     As a direct and proximate result of Defendants' actions, Plaintiff suffered and continues to suffer considerable damages.

## SECOND CAUSE OF ACTION
**Hostile Work Environment Based on Age, Creed (Religion) & Disability In Violation of the New York City Human Rights Law, N.Y. Admin. Code §8-101, *et seq.* Against all defendants**

80.     Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

81.     By the actions described above, Defendants subjected Plaintiff to a hostile work environment and inferior terms, conditions or privileges of employment on account of her age, creed (religion) and disability.

82.     Specifically, the workplace maintained by the Defendants was permeated with discriminatory intimidation and illegal tactics used to pressure the Plaintiff into submitting to an act  that would have caused damage to her closely held religious convictions, caused harm to the existing medical condition, impinged on her medical privacy and bodily integrity, and engaged in a practice of ridicule and insult that was sufficiently severe and pervasive so as to alter the conditions of the Plaintiff's employment and created a hostile and abusive working environment.

83.     As a direct and proximate result of Defendants' actions, Plaintiff suffered and continues to suffer considerable damages.

### THIRD CAUSE OF ACTION
**Discrimination Based on Age, Creed (Religion) & Disability In Violation of New York State Human Rights Law, N.Y. Exec. Law § 290, *et seq.* Against all defendants**

84.     Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

85.     NY Exec. Law § 296 provides that it shall be an unlawful discriminatory practice (a) for an employer or licensing agency, because of an individual's **age**, race, **creed**, color, national origin, sexual orientation, gender identity or expression, military status, sex, **disability**, predisposing genetic characteristics, familial status, marital status, or status as a victim of domestic violence, to refuse to hire or employ or to bar or to **discharge from employment** such individual or to **discriminate against such individual in compensation or in terms, conditions or privileges of employment**.

86.     Defendant engaged in multiple unlawful discriminatory practices by (a) failing to accommodate her closely held religious beliefs, (b) failing to accommodate her underlying medical

conditions, (c) failing to engage in an interactive dialogue concerning her medical conditions, (d) treating her in a hostile manner, (e) treating her differently than other employees who did not have her religious convictions, (f) treating her differently due to her underlying medical conditions, (g) causing physical harm in retaliation of her request for a reasonable accommodation based on her creed (religion) and medical condition, (h) being replaced by younger, less experience employees, (i) being wrongfully discharged in retaliation for her desire to secure a religious and medical exemption, and her opposition thereto.

87.     By the actions described above, Defendants discriminated against plaintiff on the basis of her age, creed (religion) and disability by subjecting her to terms and conditions of employment that were inferior to those of younger employees, employees who were similarly situated but not of the same, or similar religious conviction, and employees who did not have her particular medical conditions.

88.     As a direct and proximate result of Defendants' actions, Plaintiff suffered and continues to suffer considerable damages.

## FOURTH CAUSE OF ACTION
**Discrimination Based on Age, Creed (Religion) & Disability In Violation of the New York City Human Rights Law, N.Y. Admin. Code §8-101,** *et seq.* **Against all defendants**

89.     Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

90.     NY Admin. Code §8-107 provides, in relevant part, that it shall be an unlawful discriminatory practice for an employer or an employee or agent thereof **to impose upon a person as a condition of obtaining or retaining employment any terms or conditions, compliance with which would require such person to violate, or forego a practice of, such person's creed or religion**, including but not limited to the observance of any particular day or days or any portion

thereof as a sabbath or holy day or the observance of any religious custom or usage, and the employer shall make reasonable accommodation to the religious needs of such person;

91.     NY Admin. Code §8-107 further provides, in relevant part, that it shall be an unlawful discriminatory practice for an employer or an employee or agent thereof, because of the actual or perceived **age**, race, **creed**, color, national origin, gender, **disability**, marital status, partnership status, caregiver status, sexual and reproductive health decisions, sexual orientation, uniformed service or immigration or citizenship status of any person (2) To refuse to hire or employ or to bar or to discharge from employment such person; or (3) To discriminate against such person in compensation or in terms, conditions or privileges of employment.

92.     Defendant engaged in multiple unlawful discriminatory practices by (a) failing to accommodate her closely held religious beliefs, (b) failing to accommodate her underlying medical conditions, (c) failing to engage in an interactive dialogue concerning her medical conditions, (d) treating her in a hostile manner, (e) treating her differently than other employees who did not have her religious convictions, (f) treating her differently due to her underlying medical conditions, (g) causing physical harm in retaliation of her request for a reasonable accommodation based on her creed (religion) and medical condition, (h) being replaced by younger, less experience employees, (i) being wrongfully discharged in retaliation for her desire to secure a religious and medical exemption, and her opposition thereto.

93.     By the actions described above, Defendants discriminated against Plaintiff on the basis of her age, creed (religion) and disability by subjecting her to terms and conditions of employment that were inferior to those of younger employees, employees who were similarly situated but not of the same, or similar religious conviction, and employees who did not have her particular medical conditions.

94.     As a direct and proximate result of Defendants' actions, Plaintiff suffered and continues to suffer considerable damages.

**FIFTH CAUSE OF ACTION**
**Retaliation In Violation of New York State Human Rights Law, N.Y. Exec. Law § 290, *et seq.* Against all Defendants**

95.      Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

96.     NY Exec. Law § 296 provides that it shall be an unlawful discriminatory practice for any person engaged in any activity to which this section **applies to retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article** or because he or she has filed a complaint, testified or assisted in any proceeding under this article.

97.     Defendants engaged in multiple unlawful discriminatory practices by (a) failing to accommodate her closely held religious beliefs, (b) failing to accommodate her underlying medical conditions, (c) failing to engage in an interactive dialogue concerning her medical conditions, (d) treating her in a hostile manner, (e) treating her differently than other employees who did not have her religious convictions, (f) treating her differently due to her underlying medical conditions, (g) causing physical harm in retaliation of her request for a reasonable accommodation based on her creed (religion) and medical condition, (h) being replaced by younger, less experience employees, (i) being wrongfully discharged in retaliation for her desire to secure a religious and medical exemption, and her opposition thereto.

98.     Defendants retaliated against Plaintiff because she engaged in a protected activity by making complaints about the discrimination and there existed a causal link between such protected activity and the adverse employment decisions to which she was subjected.

99.     As a direct and proximate result of Defendants' wrongful actions, Plaintiff suffered and continues to suffer economic damage, severe mental anguish and emotional distress, including,

but not limited to, stress, anxiety, depression, embarrassment, loss of self-esteem, loss of appetite, loss of sleep, emotional pain and suffering, and other stress related ailments.

## SIXTH CAUSE OF ACTION
### Retaliation In Violation of the New York City Human Rights Law, N.Y. Admin. Code §8-101, *et seq.* Against all Defendants

100.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

101.    NY Admin. Code §8-107 provides, in relevant part, that it shall be an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to **retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter**, (ii) **filed a complaint**, testified or assisted in any proceeding under this chapter, (iii) commenced a civil action alleging the commission of an act which would be an unlawful discriminatory practice under this chapter, (iv) assisted the commission or the corporation counsel in an investigation commenced pursuant to this title, (v) requested a reasonable accommodation under this chapter, or (vi) provided any information to the commission pursuant to the terms of a conciliation agreement made pursuant to section 8-115 of this chapter.

102.    Defendants engaged in multiple unlawful discriminatory practices by (a) failing to accommodate her closely held religious beliefs, (b) failing to accommodate her underlying medical conditions, (c) failing to engage in an interactive dialogue concerning her medical conditions, (d) treating her in a hostile manner, (e) treating her differently than other employees who did not have her religious convictions, (f) treating her differently due to her underlying medical conditions, (g) causing physical harm in retaliation of her request for a reasonable accommodation based on her creed (religion) and medical condition, (h) being replaced by younger, less experience employees,

(i) being wrongfully discharged in retaliation for her desire to secure a religious and medical exemption, and her opposition thereto.

103.    Defendants retaliated against plaintiff because she engaged in a protected activity by making complaints about the discrimination and there existed a causal link between such protected activity and the adverse employment decisions to which she was subjected.

104.    As a direct and proximate result of defendants' wrongful actions, Plaintiff suffered and continues to suffer economic damage, severe mental anguish and emotional distress, including, but not limited to, stress, anxiety, depression, embarrassment, loss of self-esteem, loss of appetite, loss of sleep, emotional pain and suffering, and other stress related ailments.

### SEVENTH CAUSE OF ACTION
**Aiding & Abetting In Violation of New York State Human Rights Law, N.Y. Exec. Law § 290, *et seq*. Against all Defendants**

105.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

106.    NY Exec. Law § 296(6) it shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so.

107.    By the actions described above, defendants Ms. Claus, Ms. Rudich, Ms. Louh, Ms. Karp, Ms. Luquis and Ms. McFadden aided and abetted the discrimination perpetrated against plaintiff by condoning, encouraging and allowing such conduct to occur on account on Plaintiff's protected classifications.

108.    As a direct and proximate result of Defendants' actions, Plaintiff suffered and continues to suffer considerable damages.

### EIGHTH CAUSE OF ACTION
**Aiding and Abetting In Violation of the New York City Human Rights Law, N.Y. Admin. Code §8-101, *et seq*. Against all Defendants**

109.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

110.    NY Admin. Code §8-107(6) states that it shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so.

111.    By the actions described above, Defendants Ms. Claus, Ms. Rudich, Ms. Louh, Ms. Karp, Ms. Luquis and Ms. McFadden aided and abetted the discrimination perpetrated against plaintiff by condoning, encouraging and allowing such conduct to occur on account on plaintiff's protected classifications.

112.    As a direct and proximate result of Defendants' actions, Plaintiff suffered and continues to suffer considerable damages.

### NINTH CAUSE OF ACTION
**Disability Discrimination In Violation of the ADA, Against all Defendants**

113.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

114.    Pursuant to 42 USC § 12112(a), it provides a general rule that no covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

115.    Furthermore, in order to plead a violation of the ADA, a plaintiff must allege that (1) he or she is a qualified individual with a disability; (2) the defendants are subject to the ADA; and (3) he or she was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or otherwise discriminated against by defendants, by reason of his or her disability.

116.    Plaintiff suffers from a variety of Autoimmune Disorders, which qualify as a disability under both the ADA, NYCHL and NYAC.

117.    Defendants are subject to the ADA as they have more than 15 employees.

118.    The Defendants have engaged in a variety of discriminatory acts based on her disabilities, including but not limited to (a) failing to accommodate her underlying medical conditions, (b) failing to engage in an interactive dialogue concerning her medical conditions, (c) treating her in a hostile manner, (d) treating her differently due to her underlying medical conditions, (e) causing physical harm in retaliation of her request for a reasonable accommodation based on her creed (religion) and medical condition, (f) being wrongfully discharged in retaliation for her desire to secure a religious and medical exemption, and her opposition thereto.

119.    As a direct and proximate result of Defendants' actions, Plaintiff suffered and continues to suffer considerable damages.

## TENTH CAUSE OF ACTION
**A Failure To Accommodate or Engage In An Interactive Dialogue In Violation of the ADA, Against all Defendants**

120.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

121.    Pursuant to 42 USC § 12112(b)(5), it provides that no covered entity shall discriminate against a qualified individual on the basis of disability, which includes, (A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity; or (B) denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the

need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant;

122.   Plaintiff suffers from a variety of Autoimmune Conditions, which qualify as a disability under both the ADA, NYCHL and NYAC.

123.   Defendants are subject to the ADA as they have more than 15 employees.

124.   As a result of the Defendants failure to accommodate the Plaintiff, of which would have required minimal to no effort to comply, as she enjoyed the same position for approximately 15 years, the plaintiff was denied meaning access to activities of which she was legally entitled to.

125.   As a direct and proximate result of Defendants' actions, Plaintiff suffered and continues to suffer considerable damages.

<u>**ELEVENTH CAUSE OF ACTION**</u>
**Defendants Engaged In An Unlawful Medical Examination In Violation of the ADA, Against all Defendants**

126.   Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

127.   Pursuant to 42 USC § 12112(d)(4), it provides the rules for Examinations & Inquiries. Pursuant to 42 USC § 12112(d)(4)(A) a covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

128.   Under the ADA, an employer "may 'not require a medical examination ... [or inquire] of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity' (*42 USC § 12112 (d)(4)(A)." Shannon v Verizon New York Inc., 2009 WL 1765010, *3, 2009 US Dist LEXIS 45160, *8-9 (ND NY 2009)*). "[A]n employer must

show that the asserted business necessity is 'vital to the business' ... and that 'the request is no broader or more intrusive than necessary.'" *Rivera v Smith,  [\*\*16]  2009 WL 124968, \*4, 2009 US Dist LEXIS 3523, \*12 (SD NY 2009), affd 375 Fed Appx 117 (2d Cir 2010)*. Further, a determination of whether a fitness for duty examination is appropriate requires careful review of the underlying facts. See *Rosenquist v Ottaway Newspapers, Inc., 90 Fed Appx 564 (2d Cir)*.

129.    Based on the underlying information, and in accordance with 29 CFR 1630.13, it is unlawful for a covered entity to require a medical examination of an employee or to make inquiries as to whether an employee is an individual with a disability or as to the nature or severity of such disability.

130.    In exchanges sent by the Defendants, which copied multiple employees who do not have a need to know the Plaintiff's medical information, Plaintiff was asked by Ms. Karp, in a non-discrete fashion, out in the open, questions such as whether or not her medical conditions were long standing, whether her medical condition was suddenly developed after the August 6, 2021 deadline, etc., all of which are black letter law violations of the prohibitions of 29 CFR 1630.13

131.    As a result of the defendants clear violation of the prohibition from making examinations and inquiries, which were not only improper, but also not tied to any business necessity,  the Plaintiff continued to suffer from detriment that was unnecessary and unlawful.

132.    As a direct and proximate result of Defendants' actions, Plaintiff suffered and continues to suffer considerable damages.

### TWELFTH CAUSE OF ACTION
### Retaliation In Violation of the ADA Against all Defendants

133.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

134.    Pursuant to 42 USC § 12203(a) no person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this Act or because such

individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the ADA.

135.   Pursuant to 42 USC § 12203(b) it shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by the ADA.

136.   To state a prima facie case of retaliation under either the ADA or the Rehabilitation Act ("RHA"), a plaintiff must demonstrate that (1) she engaged in an activity protected by the [Act]; (2) the employer was aware of this activity; (3) the employer took adverse employment action against him; and (4) a causal connection exists between the alleged adverse action and the protected activity." See *Treglia v Town of Manlius, 313 F3d 713, 719 (2002).*

137.   Plaintiff sought a reasonable accommodation through the ADA as it concerned her Autoimmune Conditions, the Defendants were aware of her Autoimmune Conditions and her need for a reasonable accommodation. Rather than engage in an interactive process and dialogue, the Defendants continued to discriminate, harass and ultimately wrongfully terminate the Plaintiff in retaliation for engaging in the protected activity.

138.   Defendants retaliated against plaintiff because she engaged in a protected activity as she sought a reasonable accommodation under the ADA as it concerned her Autoimmune Conditions and by making complaints about the invidious discrimination.  There existed a causal link between such protected activity and the adverse employment decisions to which she was subjected.

139.   As a direct and proximate result of defendants' wrongful actions, Plaintiff suffered and continues to suffer economic damage, severe mental anguish and emotional distress, including,

but not limited to, stress, anxiety, depression, embarrassment, loss of self-esteem, loss of appetite, loss of sleep, emotional pain and suffering, and other stress related ailments.

**THIRTEENTH CAUSE OF ACTION**

**Disclosure of Confidential Medical Information in violation of the ADA, 42 U.S.C. § 12112 *et. seq.* Against all Defendants**

140.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

141.    Pursuant to 42 U.S.C. § 12112 the Defendant is permitted make inquiries into the ability of an employee to perform job-related functions, however, subject any information obtained regarding the medical condition or history is collected and maintained on separate forms, in separate medical files and is treated as a confidential medical record.  This means that no one except "supervisors" and "managers" may be informed regarding <u>necessary</u> restrictions on the work or duties of the employee and <u>necessary accommodations</u>.

142.    Defendant, through its agents, servants and/or employees, intentionally, wantonly and/or negligently and recklessly disclosed Plaintiff's Autoimmune Conditions and other confidential and/or personal medical information to many of Plaintiff's co-workers, all of who did not have a need to know such information, and such disclosure did nothing at all to advance the intention of the Plaintiff, namely to engage in an interactive dialogue to discuss reasonable accommodations.

143.    Plaintiff's co-workers were not authorized medical personnel and were not individuals who should have been privy to said information.

144.    Defendant's disclosure of Plaintiff's Autoimmune Conditions and other confidential medical and/or personal information constitutes a violation of the AD, 42 U.S.C. § 12101, *et seq*.

145.    As a direct and proximate result of Defendant's disclosure of Plaintiff's medical condition and confidential and/or personal medical information, Plaintiff has loss of wages and other fringe benefits; suffered mental anguish and severe emotional distress; humiliation, embarrassment, pain and suffering and loss of enjoyment of life; and she has suffered other non-pecuniary losses, all of which will be proven at a trial of this action.

## FOURTEENTH CAUSE OF ACTION
### Hostile Work Environment Based on Age In Violation of ADEA, 29 U.S.C. § 621 *et seq.* Against all Defendants

146.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

147.    By the actions described above, defendants subjected plaintiff to a hostile work environment and inferior terms, conditions or privileges of employment on account of her age.

148.    Specifically, one of the motivating factors in releasing the Plaintiff, as opposed to other similarly situated workers, was her age.  There is a far greater benefit to terminate the Plaintiff, who is higher earning, is a greater risk to health insurance premium, and who will be vested in pension rights as she nears her retirement, than the costs associated with maintaining her.

149.    By making the conscious decision to terminate the Plaintiff, and replace the Plaintiff with younger coworkers, in light of the pecuniary benefits associated with releasing the Plaintiff as opposed to those younger workers, at least part of the decision in engaging in such wrongful treatment of the plaintiff was predicated on her age.

150.    As a direct and proximate result of Defendants' actions, Plaintiff suffered and continues to suffer considerable damages.

## FIFTEENTH CAUSE OF ACTION
### Discrimination Based on Age In Violation of ADEA, 29 U.S.C. § 623(a) Against all Defendants

151.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

152.    Pursuant to 29 USC § 623(a), it provides in relevant part that it shall be unlawful for an employer— (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age; (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or (3) to reduce the wage rate of any employee in order to comply with the ADEA.

153.    By the actions described above, defendants subjected plaintiff to discriminatory treatment and inferior terms, conditions or privileges of employment on account of her age.

154.    Specifically, one of the motivating factors in releasing the plaintiff, as opposed to other similarly situated workers, was her age.  There is a far greater benefit to terminate the plaintiff, who is higher earning, is a greater risk to health insurance premium, and who will be vested in pension rights as she nears her retirement, than the costs associated with maintaining her.

155.    By making the conscious decision to terminate the plaintiff, and replace the plaintiff with younger coworkers, in light of the pecuniary benefits associated with releasing the Plaintiff as opposed to those younger workers, at least part of the decision in engaging in such wrongful treatment of the plaintiff was predicated on her age

156.    As a direct and proximate result of Defendants' actions, Plaintiff suffered and continues to suffer considerable damages.

## SIXTEENTH CAUSE OF ACTION
**Retaliation Based on Age In Violation of ADEA, 29 U.S.C. § 623(d) Against all Defendants**

157.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

158.     Pursuant to 29 USC § 623(d), it provides in relevant part that it shall be unlawful for an employer to discriminate against any of his employees or applicants for employment, for an employment agency to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because such individual, member or applicant for membership has opposed any practice made unlawful by this section, or because such individual, member or applicant for membership has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under the ADEA.

159.     By the actions described above, Defendants subjected Plaintiff to retaliatory treatment and inferior terms, conditions or privileges of employment on account of her age.

160.     Specifically, one of the motivating factors in releasing the Plaintiff, as opposed to other similarly situated workers, was her age.  There is a far greater benefit to terminate the Plaintiff, who is higher earning, is a greater risk to health insurance premium, and who will be vested in pension rights as she nears her retirement, than the costs associated with maintaining her.

161.     By making the conscious decision to terminate the Plaintiff, and replace the Plaintiff with younger coworkers, in light of the pecuniary benefits associated with releasing the Plaintiff as opposed to those younger workers, at least part of the decision in engaging in such wrongful treatment of the Plaintiff was predicated on her age.

162.     As a direct and proximate result of Defendants' actions, Plaintiff suffered and continues to suffer considerable damages.

## SEVENTEENTH CAUSE OF ACTION
### Hostile Work Environment Based on Age, Creed (Religion) & Disability In Violation of Title VII of the Civil Rights Act, 42 U.S.C. §2000e-2(a)(1) Against all Defendants

163.     Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

164.    By the actions described above, Defendants subjected Plaintiff to a hostile work environment and inferior terms, conditions or privileges of employment on account of her age, creed (religion) and disability.

165.    Specifically, the workplace maintained by the Defendants was permeated with discriminatory intimidation and illegal tactics used to pressure the Plaintiff into engaging in a behavior that would have caused damage to her closely held religious convictions, caused harm to the existing medical condition, impinged on her medical privacy and bodily integrity, and engaged in a practice of ridicule and insult that was sufficiently severe and pervasive so as to alter the conditions of the Plaintiff's employment and created a hostile and abusive working environment

166.    As a direct and proximate result of Defendants' actions, Plaintiff suffered and continues to suffer considerable damages.

## EIGHTEENTH CAUSE OF ACTION
**Discrimination Based on Age, Creed (Religion) & Disability In Violation of Title VII of the Civil Rights Act, 42 U.S.C. §2000e-2(a), Against all Defendants**

167.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

168.    42 USCS § 2000e-2(a) provides that it shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

169.    Defendant engaged in multiple unlawful discriminatory practices by (a) failing to accommodate her closely held religious beliefs, (b) failing to accommodate her underlying medical conditions, (c) failing to engage in an interactive dialogue concerning her medical conditions, (d) treating her in a hostile manner, (e) treating her differently than other employees who did not have her religious convictions, (f) treating her differently due to her underlying medical conditions, (g) causing physical harm in retaliation of her request for a reasonable accommodation based on her creed (religion) and medical condition, (h) being replaced by younger, less experience employees, (i) being wrongfully discharged in retaliation for her desire to secure a religious and medical exemption, and her opposition thereto.

170.    By the actions described above, Defendants discriminated against Plaintiff on the basis of her age, creed (religion) and disability by subjecting her to terms and conditions of employment that were inferior to those of younger employees, employees who were similarly situated but not of the same, or similar religious conviction, and employees who did not have her particular medical conditions.

171.    As a direct and proximate result of Defendants' actions, Plaintiff suffered and continues to suffer considerable damages.

## NINETEENTH CAUSE OF ACTION
**Retaliation in Violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-3, Against all Defendants**

172.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

173.    Pursuant to 42 USC § 2000e-3(a), It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any

individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this title, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title.

174.     Plaintiff sought a reasonable accommodation through the Title VII as it concerned her closely held religious convictions and beliefs.  The Defendants were aware of her closely held religious convictions and beliefs and her need for a reasonable accommodation. Rather than engage in an interactive process and dialogue, the Defendants continued to discriminate, harass and ultimately wrongfully terminate the Plaintiff in retaliation for engaging in the protected activity.

175.     Defendants retaliated against Plaintiff because she engaged in a protected activity as she sought a reasonable accommodation under Title VII as it concerned her closely held religious convictions and beliefs and by making complaints about the invidious discrimination. There existed a causal link between such protected activity and the adverse employment decisions to which she was subjected.

176.     As a direct and proximate result of Defendants' wrongful actions, Plaintiff suffered and continues to suffer economic damage, severe mental anguish and emotional distress, including, but not limited to, stress, anxiety, depression, embarrassment, loss of self-esteem, loss of appetite, loss of sleep, emotional pain and suffering, and other stress related ailments.

## <u>TWENTIETH CAUSE OF ACTION</u>
### Intentional Infliction of Emotional Distress Against all Defendants

177.     Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

178.     Plaintiff asserts intentional infliction of emotional distress. Under New York law, "the elements of a claim for intentional infliction of emotional distress are (i) extreme and outrageous conduct, (ii) an intent to cause or disregard a substantial probability of causing severe

emotional distress, (iii) a causal connection between the conduct and the injury, and (iv) the resultant severe emotional distress." See *Lau v. S & M Enters., 72 A.D.3d 497, 498 [1st Dept. 2010].*

179.    Extreme and Outrageous conduct is found when someone intentionally or recklessly causes severe emotional distress to another, such that the conduct is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

180.    The Defendants have shown a reckless disregard for the plaintiff's medical health, by ignoring her reasonable request of an accommodation to avoid the vaccine requirements, and rather, participate in the COVID-19 weekly testing program, which made sense as she did not maintain a position that had any proximity to any personnel around her.

181.    Not only did they ignore her reasonable request for an accommodation, telling her that deadline expired for her medical exemption (as if her medical condition simply turns off on a certain date), but in retaliation for her attempt to exercise her valid and lawful rights, her medical and religious concerns were outright ignored, she was subjected to unnecessary force when she went for her COVID testing in October, and rather than have the decency to respond to her emails and queries, she was simply turned off and told that she "voluntarily resigned."

182.    By the actions described above, defendants intentionally inflicted emotional distress on the plaintiff, with an extreme and outrageous disregard for her mental and physical health.

183.    As a direct and proximate result of Defendants' actions, Plaintiff suffered and continues to suffer considerable damages.

**INJURY AND DAMAGES**

184.     As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of a career and the loss of a salary, bonuses, benefits and other compensation which such employment entails, out-of-pocket medical expenses and Plaintiff has also suffered future pecuniary losses, emotional pain, Suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Plaintiff has further experienced severe emotional and physical distress.

*WHEREFORE* Plaintiff respectfully requests that this Court enter judgment containing the following relief:

a.   A declaratory judgment that the actions, conduct and practices of the Defendants complained of herein constitute an unlawful employment practice and are in violation of the ADA, Title VII, the ADEA, the NYSHRL and the NYAC and that the defendant has harassed, discriminated against, and retaliated against Plaintiff,

b.   An injunction and order permanently restraining Defendants and their partners, officers, owners, agents, successors, employees and representatives, and any and all persons acting in concert with them, from engaging in any such further unlawful conduct, including the policies and/or practices complained of herein;

c.   An award of damages against Defendants for an amount to be proven at trial, plus interest, to compensate for all monetary and/or economic damages, including, but not limited to, loss of past and future income, wages, compensation and other benefits of employment;

d.   An award of damages against Defendants for an amount to be proven at trial, plus interest, to compensate for all non-monetary and compensatory damages, including but not limited to, compensation for plaintiff's mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering, and emotional distress;

e.  An award of damages against Defendants for an amount to be proven at trial, plus interest, for any and all other monetary and non-monetary losses suffered by plaintiff, including, but not limited to, reputational harm and harm to professional reputation;

f.  An award of punitive damages against Defendants for an amount to be determined by a jury;

g.  Prejudgment and post-judgment interest on all amounts due;

h.  An award of costs that Plaintiff incurred in this action, including, but not limited to, Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and

i.  Such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

The Plaintiff hereby demands a trial by jury in this matter.

Respectfully submitted,

Dated:      January 25, 2023
             New York, New York

_____
Vincent Miletti, Esq.
The Law Firm of Vincent Miletti, Esq.
2139 East 3rd Street
Brooklyn, New York 11223
*NY Bar No. 5194014*
(Office) (609) 353-6287
(Fax) (609) 554-7297
(Direct) (347) 234-0034
(Email) vmiletti@milettilaw.com
*Counsel to Plaintiff Stephanie Grimes*

To:    Liza M. Velazquez
       Paul, Weiss, Rifkind, Wharton & Garrison, LLP
       1285 Avenue of the Americas
       New York, New York 10019-6064
       (212) 373-3000
       lvelazquez@paulweiss.com

**VERIFICATION**

STATE OF NEW YORK    )
                               )

COUNTY OF KINGS      )

       Ms. STEPHANIE GRIMES, hereby attest, affirm, verify, deposes and says that she is the

Plaintiff in this matter, that she has read the foregoing Verified Complaint and that she believes

that the facts set forth therein are true and correct to the best of her knowledge, information, and

belief.  Ms. STEPHANIE GRIMES knowledge or information and belief, is based on personal

knowledge of the facts of this case.

_____
STEPHANIE GRIMES

Sworn to me, the undersigned, before

this _____ day of January 2023.

_____
NOTARY PUBLIC

SUSAN PASCARELLA
Notary Public, State of New York
No. 01PA6238844
Qualified in Kings County
Term Expires April 11, 20__

## <u>CERTIFICATE OF SERVICE</u>

I certify that this document is being filed through the Case Management / Electronic Case Filing (CM/ECF) system, which serves counsel for other parties who are registered participants as identified on the Notice of Electronic Filing (NEF).  An electronic copy of the foregoing was sent via CM/ECF to all parties.  Any counsel for other parties who are not registered participants are being served by first class mail on the date of electronic filing.

_____

Vincent Miletti, Esq.