UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEPHANIE GRIMES, | |
| Plaintiff, | Case # 23-CV-00652 |
| - v – | |
| THE NEW YORK AND PRESBYTERIAN HOSPITAL | |
| Defendant, | |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

August 4, 2023

Vincent Miletti, Esq.
**THE LAW OFFICES OF VINCENT MILETTI, ESQ.**
10 Halletts Point, # 1742, Astoria, New York 11102
(609) 353-6287 (Direct) (609) 554-7927 (Fax)  VMiletti@Milettilaw.com (Email)
*Attorney for Plaintiff Ms. Stephanie Grimes*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................................... 3

LEGAL STANDARD ................................................................................................................... 3

TITLE VII AND THE FAILURE TO PROVIDE A REASONABLE ACCOMMODATION FOR CLOSELY
HELD RELIGIOUS CONVICTIONS .............................................................................................. 5

   A.   THE AMENDED COMPLAINT ADEQUATELY STATES A CLAIM FOR RELIGIOUS
DISCRIMINATION CLAIM UNDER TITLE VII. .............................................................................. 6

   B.   DEFENDANT SUGGESTS AN IMPROPER STANDARD IN SEC. I(B) – IT IS NOT "BECAUSE OF"
BUT RATHER, "A MOTIVATING FACTOR" STANDARD. ................................................................. 7

   C.   CONTRARY TO THE PUBLIC RECORD, STATE LAW DID NOT PROHIBIT TITLE VII
REASONABLE ACCOMMODATIONS FOR RELIGION. .................................................................... 8

   D.   THE DOH MANDATE, 10 NYCRR § 2.61, DOES NOT SANCTION A PRACTICE THAT IS
UNLAWFUL UNDER TITLE VII. IT DOES NOT DENY RELIGIOUS ACCOMMODATIONS. ...................... 8

   E.   THE GUIDANCE FROM THE DOH DATED NOVEMBER 15, 2021, WHICH SET FORTH THE
UNDERLYING REASONING FOR MS. GRIMES TERMINATION, STATED CLEARLY TITLE VII
ACCOMMODATIONS WERE OKAY & NOT RESTRICTED. ............................................................. 10

   F.   THERE WAS NO UNDUE HARDSHIP, AS ARGUED BY THE HOSPITAL, BECAUSE A RELIGIOUS
ACCOMMODATION WAS NEVER A VIOLATION OF STATE LAW ................................................... 11

      I.   THE LAW DID NOT PROHIBIT GRANTING MS. GRIMES A REASONABLE
ACCOMMODATION. .............................................................................................................. 11

      II.   THERE WAS NO OTHER UNDUE HARDSHIP TO PROVIDE MS. GRIMES WITH HER
ACCOMMODATION. .............................................................................................................. 12

      III.  MS. GRIMES POSITION (QUALITY MANAGEMENT SPECIALIST) PRE-PANDEMIC, DURING
THE PANDEMIC, POST TERMINATION & POST PANDEMIC ......................................................... 13

THE DEFENDANT'S FAILURE TO ENGAGE IN AN INTERACTIVE PROCESS ................................... 13

   A.   AT NO POINT IN TIME DID DEFENDANT ENGAGE IN A CASE-BY-CASE DETERMINATION TO
DETERMINATION AVAILABLE ACCOMMODATIONS OR SHOW A SUBSTANTIAL HARDSHIP. ............. 13

   B.   THE AMENDED COMPLAINT READILY ACHIEVES THE PLAUSIBLE STANDARD, AND THE
DEFENDANT FAILED TO ENGAGE IN THE INTERACTIVE PROCESS; DEFENDANT'S ATTEMPT TO
CONFUSE IS POINTLESS. ........................................................................................................ 15

DEFENDANT CAN NOT REFUTE PLAINTIFF'S PRIMA FACE CASE OF ADA VIOLATIONS ................ 17

   A.   PLAINTIFF NEED NOT ESTABLISH A PRIMA FACE CASE AT THIS STAGE & UNDOUBTABLY
ASSERTS SUFFICIENT PLAUSIBLE FACTS AS TO DISABILITY DISCRIMINATION UNDER THE ADA.
17

   B.   PLAINTIFF DID NOT RESIGN FROM EMPLOYMENT, RATHER WAS TERMINATED. ................... 19

   C.   MCBRIDE IS READILY DISTINGUISHABLE AS A REASONABLE ACCOMMODATION WAS
READILY AVAILABLE, DEFENDANT ADMITS TO IT, SO WHY WAS THERE NO UNDUE HARDSHIP
ANALYSIS OR EVALUATION? ................................................................................................. 21

   D.   WHILE THE HOSPITAL DID NOT BOTHER WITH A MEDICAL INQUIRY, THE EXCHANGE THEY
CONSIDER AN INQUIRY VIOLATES 29 CFR § 13630.14(C)(1) AND 42 USC § 12112 AS IT WAS NOT
HANDLED IN ACCORDANCE WITH THE STATUTES AND PLAINTIFF'S PROTECTIONS. ...................... 22

THE CATCHALL ARGUMENTS IN SEC III, IV, AND V DO NOT DEFEAT THE PLAUSIBLE PLEADING
STANDARD REQUIREMENT ..................................................................................................... 24

IN LIGHT OF GROFF, PLAINTIFF'S CLAIMS FOR EMOTIONAL DISTRESS ARE NOT SUBJECT TO
DISMISSAL & ARE A QUESTION FOR THE JURY. ....................................................................... 26

Plaintiff, Stephanie Grimes ("Grimes" or "Plaintiff"), through her attorney, Vincent Miletti, Esq., with the Law Offices of Vincent Miletti, Esq., respectfully submits this Memorandum of Law in Opposition ("Opposition") to the Defendant's, THE NEW YORK AND PRESBYTERIAN HOSPITAL ("NYPH," "Hospital") or "Defendant"), Motion to Dismiss ("Motion"), ECF No. 25, respectfully asking this Court to deny Defendant's Motion in its entirety.

## PRELIMINARY STATEMENT

1.      In an effort to preserve space and only keep relevant information in this Opposition, the Preliminary Statement, along with a list of proffered exhibits and relevant printouts, will be contained in the Declaration of Vincent Miletti, Esq., dated July 31, 2023 ("Miletti Decl."). Only those relevant facts related to the Opposition will be contained herein. Furthermore, Plaintiff refers the Court to both the Declaration of Vincent Miletti, Esq., dated July 31, 2023 ("Miletti Decl."), the Declaration of Stephanie Grimes, sworn to on July 31, 2023 ("Grimes Decl."), and all relevant exhibits annexed thereto for a recitation of the relevant facts.

## LEGAL STANDARD

2.      The biggest issue that you find in the Motion filed by the Defendant is that the Defendant attempts to disregard the liberal pleading standard that is required to survive a motion to dismiss. However, the test isn't complicated. To survive a motion to dismiss for a Title VII claim, the Plaintiff here would have to plausibly allege two elements: (1) that the employer discriminated against her, and (2) she was discriminated against because of her race, color, religion, sex, or national origin. For an ADA claim, we add disability. For an ADEA claim, we add age. It is black-letter law that the burden is minimal, and the well-pleaded factual allegations must plausibly give rise to an inference of unlawful discrimination.

3.      In a case involving alleged religious discrimination, a plaintiff may satisfy this burden by plausibly alleging that he or she actually required an accommodation of his or her religious practice and that the employer's desire to avoid the prospective accommodation was a motivating factor in an employment decision. See *Lowman v. NVI LLC*, 821 Fed. Appx. 29 (2020).

4.      For whatever reason, Defendant attempts to use the term "plausible" in an equivocal fashion and, thus, deliberately confuses the "plausible" standard between different paragraphs.

5.      The fact of the matter is that when evaluating the sufficiency of a complaint under Rule 12(b)(6), the Court must construe the Complaint in a light most favorable to the nonmoving party, accept well-pleaded facts as true, and draw all inferences in the nonmoving party's favor. *Patane v. Clark*, 508 F.3d 106 (2007). To survive a Rule 12(b)(6) motion, as sought by Defendant, the complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). *Pizarro v. Euros El Tina Rest. Lounge & Billiards Corp.,* 2022 U.S. Dist. LEXIS 28426 (2022).

6.      A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. In considering the motion, the Court "must limit itself to the facts stated in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." See *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 54 (1999). See *D'Cunha v. Northwell Health Sys*., 2023 U.S. Dist. LEXIS 33343 (2023).

7.      This is a very easy hurdle for Plaintiff in this matter. The face of published public records, along with the documents already in this Court's possession, particularly the guidance from the DOH Mandate (**Exhibit A**) and how Defendant has sought to interpret it, where Defendant contends were the main source of their woes, the undisputed factual record demonstrates that the Hospital (a) failed to maintain even a minimum standard as it concerns the rights of Plaintiff under Title VII, ignored her closely-held religious convictions and sought to blame the DOH Mandate (meanwhile the <u>DOH Mandate expressly permitted what they were ignoring</u>), (b) completely ignored her need for a medical accommodation, which is an outright violation of the ADA, (c) was further motivated to take adverse action against an older employee, who was a relatively higher earner due to her age and experience and whose retention would

have caused an increase in costs for the Hospital, and (d) engaged in what may have been one of the worst cases of human resource management counsel Plaintiff has ever seen.

8.      The Hospital attempts to present the facts in an equivocal, nonlinear manner, to attempt to confuse the Court in making it look like the appropriate actions were taken for purposes of Title VII and the ADA, but this couldn't have been further from the truth. The discriminatory acts taken by the Hospital have resulted in essentially destroying Plaintiff's life, forcing her to sell her home and relocate, stall the secondary education for her children as she could no longer afford their education, and otherwise destroy what she had built over her life, as she was essentially required to choose between preserving her commitments to God and protecting her health, versus being able to put food on the table for her family and keep a roof over their head.

9.      At the end of the day, as more thoroughly expressed below in the Miletti Decl. and the Grimes Decl., Plaintiff was deprived of her rights under the law as she was entitled to a reasonable accommodation for her closely-held religious beliefs and values (Roman Catholic) and her medical conditions (Autoimmune Conditions). The Hospital also ignored her numerous requests for interactive dialogue, ignored its obligation to conduct any analysis at all as to what constitutes an "undue hardship," and frankly, displayed an egregious ignorance of the law, even in light of publicly available and published documentation and guidance from the DOH that obligates "Facilities" such as the Hospital Defendant, to have a process in place to "consider both requests for medical exemptions and reasonable accommodation from covered personnel based on sincerely-held religious beliefs applicable to Federal & State Laws... pursuant to Title VII of the Civil Rights Act, NYS Human Rights Laws and their applicable guidance" (See **Exhibit A**).

10.     In order to combat the intentional and deliberate equivocal tactics used by Defendant in this matter, we will linearly respond to the Motion to bring this back around.

## TITLE VII AND THE FAILURE TO PROVIDE A REASONABLE ACCOMMODATION FOR CLOSELY-HELD RELIGIOUS CONVICTIONS

a.  **The Amended Complaint Adequately States A Claim For Religious Discrimination Claim Under Title VII.**

1.      Notwithstanding the liberal plausible standard on a motion to dismiss, it is **absolutely undisputed** that the factual record contains sufficient facts to establish a claim for religious discrimination under Title VII.

2.      First, Ms. Grimes' religious convictions as a devout Roman Catholic are without question. Compl. ¶ 23. It wouldn't take long for this Court, or the opposition for that matter, after about 10 seconds of testimony, that her sincerely-held religious beliefs are unquestionable. Grimes Decl. ¶ 19. Further, her sincere religious beliefs, based on the Roman Catholic church's teachings, are in direct conflict with receiving the COVID vaccine. Grimes Decl. ¶ 20-24.

3.      Second, the Hospital was informed, on numerous occasions, of Ms. Grimes' closely held religious convictions. Compl. ¶ 28, **Exhibit(s) D**, **E**. In fact, her religious exemption was originally approved on August 22, 2021. This element is without question.

4.      Third, there is no doubt that Ms. Grimes suffered from an adverse employment action. In a claim for employment discrimination, it is well settled that termination is an adverse employment action. See *Dreibelbis v. Cty. of Berks*, 438 F. Supp. 3d 304, 306 (2020). The law is clear that allegations of termination of employment for failure to comply with the conflicting employment requirement of mandatory vaccination are sufficient to plead the final element of the prima facie case of religious discrimination for failure to accommodate. See *Zelnik v. Fashion Inst. Tech*., 464 F.3d 217 (2006) (termination qualifies as adverse employment actions for purposes of Title VII claims); See *Corrales v. Montefiore Med. Ctr.,* 2023 U.S. Dist. LEXIS 55620 (2023); (finding prima facie case for failure to accommodate religious discrimination claim pled where plaintiff alleged that she had a bona fide religious belief that conflicted with the COVID-19 vaccination requirement, informed her healthcare employer of it, and her employment was terminated).

5.      The only question here, as presented in Sec. I(B) from the Motion (albeit using an erroneous standard), is whether or not Ms. Grimes' closely held religious convictions served as part of a basis for her

discriminatory treatment and adverse actions suffered. Of course, <u>the facts on their face not only scream</u> **<u>yes</u>**, <u>but also show the Hospital's rigid adherence to discriminatory treatment</u>. To support a religious harassment claim, the adverse treatment must be at least partially based on the employee's religion. The test is that a plaintiff claiming discrimination based on religion must show that the alleged discriminatory conduct was<u>, either in character or substance, discrimination because of religion</u>. See *Rivera v. P.R. Aqueduct & Sewers Auth.,* 331 F.3d 183 (2003).

6.      A plaintiff may demonstrate "an <u>inference of unlawful discrimination</u>" by showing that "the employer **<u>treats some people less favorably than others because of their religion</u>**" and "that the comparators were 'involved in acts of comparable seriousness to' the plaintiff's acts." See *Collins v. Kimberly-Clark Pennsylvania, LLC*, 708 F. App'x 48, 52 (2017). "Similarly-situated employees are those who have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." See *Smith v. ABF Freight Sys.*, 2007 U.S. Dist. LEXIS 79801 (2007). See *Joshi v. Pub. Consulting Grp., Inc.*, 2022 U.S. Dist. LEXIS 215445 (2022).

**b.   Defendant Suggests An Improper Standard in Sec. I(B) – It Is Not "Because of" But Rather, "A Motivating Factor" Standard.**

11.      Defendant, in a game of semantics, tries to establish a standard that the "adverse action" suffered was "*because of*" the protected category (her religion). See Motion, § I(B), but this is an incorrect standard and should be rejected on its face. <u>For purposes of a religious discrimination claim, a party need only show that their need for accommodation was a</u> **<u>motivating factor</u>** <u>in the employer's decision</u>. See *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768. <u>It is not a "*because of"* standard, but rather, simply a</u> **<u>motivating factor</u>**. To say that we do not allege any facts that support an inference of religious discrimination is the equivalent of an ostrich putting its head in the sand to avoid confrontation.

12.      Plaintiff was expressly told that any accommodation based on her religious beliefs would no longer be honored. Compl. ¶ 53. See **Exhibit H**. As stated above, those who were not religious, and did not have the same closely-held religious beliefs, were treated more favorably than others, such as the Plaintiff,

based on her religion. Further, it is worth noting that you don't just "lose" an accommodation—the need for a reasonable accommodation doesn't simply expire, as the underlying cause of the need for the accommodation doesn't simply vanish. The fact is that similarly situated individuals who were not religious were treated more favorably as they were permitted to retain their job and permitted to receive reasonable accommodations.

13.     Defendant continues to brazenly assert in its Motion, § I(B), that it was "*clear that the Hospital permitted religious exemptions and granted Plaintiff a religious exemption until it was prohibited from doing so by state law,*" but again—in the words of the Attorney General ("AG") of New York in September 2021, there was nothing in the DOH Mandate, 10 NYCRR § 2.61, that required Defendant to deny reasonable accommodation requests under Title VII, including those based on sincerely-held religious beliefs, on the face of the DOH Mandate.

### c.  Contrary To The Public Record, State Law Did Not Prohibit Title VII Reasonable Accommodations For Religion.

14.     Defendant contends that its behavior didn't imply discrimination toward individuals with closely-held religious beliefs but rather merely following the law, and because Plaintiff's objection to vaccination allegedly conflicted with state law, her claims require dismissal. See Motion § I(B).

15.     While this defense of "*I was just following the law*" is never a defense for an employer, particularly under 42 USC § 1983, and the case law is clear that a private employer may be held liable for the acts of its employees where the unconstitutional act was authorized or undertaken according to the official policy of the private entity employer (such as Presbyterian), and the employer's conduct could be chargeable to the state, see *Villafane v. Sposato*, 2017 U.S. Dist. LEXIS 135453 (2017), the reality is that **we do not get here, because the DOH Mandate did not permit Title VII claims to go ignored.**

### d.  The DOH Mandate, 10 NYCRR § 2.61, Does Not Sanction A Practice That Is Unlawful Under Title VII. It Does Not Deny Religious Accommodations.

16.     As a career defense attorney, this is the most egregious case of cognitive dissonance I have ever seen. It is almost right out of Orwell's 1984. First, **on the face of the document**, **nothing tells the**

**employers they are NOT permitted to provide Title VII exemptions**. See the regulation in its entirety in **Exhibit G**. **Not a single section speaks of any prohibition on Title VII protections**.

17.      The AG, defending the DOH Mandate, on numerous occasions has stated (1) § 2.61 does not expressly sanction a practice that is unlawful under Title VII or is inconsistent with the purpose of Title VII; (2) Title VII requires employers to accommodate religious beliefs, practices, or observances only to the extent that doing so would not impose "undue hardship" on the employer; (3) to the extent plaintiffs seek an accommodation, § 2.61 is silent and does not implicate Title VII at all; (4) there is no "actual conflict" between Title VII and § 2.61; (5) compliance with both Title VII and § 2.61 is not a "physical impossibility,"; (6) § 2.61 pose any obstacle to accomplishing the objectives of Congress in enacting Title VII; (7) § 2.61 does not expressly sanction a practice that is unlawful under Title VII or is inconsistent with the purpose of Title VII[1]. Title VII requires employers to accommodate religious beliefs, practices, or observances only to the extent that doing so would not impose "undue hardship" on the employer. See 42 U.S.C. § 2000e(j) ("religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business"). According to the AG, if a person is seeking a religious exemption, being distinct from an accommodation under Title VII—the AG argued that since a reasonable accommodation functions differently from an outright exemption, the DOH Mandate at § 2.61 was silent, contained no restrictions, and did not implicate Title VII at all. See **Exhibit F**.

18.      As stated boldly by the City in *Dr. A. v. Hochul*, § 2.61 does not require covered entities to deny reasonable accommodation requests under Title VII, including those based on sincerely held religious beliefs.

---

[1] Citing to California Fed. Sav. & Loan Ass'n, 479 U.S. 272 at 284 (Title VII preempts "only those state laws that expressly sanction a practice unlawful" under the statute).

19.     **This argument that granting reasonable accommodations was against the law is immediately invalidated as the drafters of the very statute themselves, according to the AG defending the DOH Mandate, had absolutely no prohibition on providing reasonable accommodations under Title VII**. This should be clear on its face, and there should be no question. This hubris needs to stop, particularly since lives were destroyed because of it.

   **e.  The Guidance From the DOH Dated November 15, 2021, Which Set Forth The Underlying Reasoning For Ms. Grimes' Termination, Stated Clearly Title VII Accommodations Were Okay & Not Restricted.**

20.     The guidance they continue to refer to from the DOH comes from a letter dated November 15, 2021. See **Exhibit A**.

> The purpose of this letter is to inform covered entities that beginning **November 22, 2021**, all covered entities must ensure that covered "personnel" under the Department's <u>August 26, 2021 – Prevention of COVID-19 Transmission by Covered Entities</u> Emergency Regulation who were previously granted religious exemptions have documentation of either a first dose COVID-19 vaccination or a valid medical exemption.  Facilities should have a process in place to consider reasonable accommodation requests from covered personnel based on sincerely held religious beliefs consistent with applicable Federal and State laws, including Equal Employment Opportunity (EEO) laws such as Title VII of the Civil Rights Act and NYS Human Rights Law, and their applicable guidance.

21.     The DOH guidance tells us that "**Facilities should have a process in place to consider reasonable accommodation request from covered personnel based on sincerely held religious beliefs consistent with applicable Federal and State laws, including EEO laws such as Title VII of the Civil Rights Act and NYS Human Rights Law**.

22.     On November 17, 2021, in correspondence from the Hospital [**Exhibit H**], it is clear on the face of the documents that the Hospital violated Title VII rights of Ms. Grimes and, frankly, all others similarly situated, having a closely-held religious conviction. The Hospital simply ignored the need for reasonable accommodations under Title VII and sought to rely on the DOH Mandate, which clearly permitted a reasonable accommodation.

23.     Looking at **Exhibit H**, which is the stated reason for the illegal refusal to accommodate religious beliefs, versus the guidance from the DOH, **Exhibit A**, it is painfully clear that this was never the case, to begin with. This Court is encouraged to read **Exhibit H** and **Exhibit A** side by side to see.

24.     The Hospital was wrong - period. The continued hubris has done nothing more than destroy the Plaintiff's life, who had an immaculate record for 20 years. There was no prohibition on reasonable accommodations for religious beliefs. This Orwellian type of revisionist history should not be countenanced— this is "creating facts" that never occurred, and the Court should not make the record what it is not. See *In re Donghia, Inc*., 2020 Bankr. LEXIS 1254 (2020).

**f. There Was No Undue Hardship, As Argued by the Hospital, Because A Religious Accommodation Was Never a Violation of State Law.**

25.     Simply put, the argument at § I(C) is egregiously incorrect on its face. We then double down on the Twilight Zone logic by arguing that *Groff v. DeJoy*, 2023 U.S. LEXIS 2790 (2023), somehow supports Defendant's argument. Defendant argues that accommodating an employee's religious beliefs would require the employer to violate state law, but this is incorrect on 2 points.

**i.  The Law Did Not Prohibit Granting Ms. Grimes A Reasonable Accommodation.**

26.     The DOH Mandate § 2.61 did not expressly sanction a practice that is unlawful under Title VII or is inconsistent with the purpose of Title VII. In fact, the case that Defendant uses as its authority, *Dr. A v. Hochul*, the AG for New York argued successfully that (1) § 2.61 does not expressly sanction a practice that is unlawful under Title VII or is inconsistent with the purpose of Title VII; (2) Title VII requires employers to accommodate religious beliefs, practices, or observances only to the extent that doing so would not impose "undue hardship" on the employer; (3) to the extent plaintiffs seek an accommodation, § 2.61 is silent and does not implicate Title VII at all; (4) there is no "actual conflict" between Title VII and § 2.61; (5) compliance with both Title VII and § 2.61 is not a "physical impossibility,"; (6) § 2.61 pose any obstacle to accomplishing the objectives of Congress in enacting Title VII. See **Exhibit F**.

27.     Further, § 2.61 did not expressly sanction a lawful practice under Title VII. As noted, Ms. Grimes sought an accommodation under Title VII and, for the time being, enjoyed the accommodation (albeit the testing was unnecessary and uncomfortable). To the extent Ms. Grimes sought an accommodation under Title VII, even in light of § 2.61, there was no conflict.

28.     Thus, the Defendant's argument that an undue hardship existed as accommodating the Plaintiff's religious beliefs would require the employer to violate state law falls flat on its face.

### ii.     No Other Undue Hardship Would Have Resulted From Providing Ms. Grimes With An Accommodation.

29.     While the regulations do NOT restrict an employer from providing a reasonable accommodation under Title VII, to avoid "*subjecting the hospital to severe penalties*" or exposing others to the risk of catching the virus, Motion § I(C), the most logical thing would have been to permit Ms. Grimes to continue her remote position, which was already 100% remote at the time of her unlawful termination. In fact, even at the time of her termination, **her position continued to be published as a remote position.** Grimes Decl, ¶ 10.

30.     However, Defendant contends that by requiring Ms. Grimes to continue in a remote position, which was already remote before the Pandemic, or to subject her to weekly testing, they were suffering from significant hardship. If an employer is going to argue that there was an "undue hardship" for purposes of Title VII, they must show that the purported hardship would be **substantial** in the context of an employer's business in the common-sense manner that it would use in applying any such test. See *Groff*.

31.     While *Groff* may have made the analysis to determine an "undue hardship" under Title VII for the purposes of assessing religious accommodations more difficult, essentially raising it to the ADA standard, even **under any standard, an analysis was never performed, and there wasn't even a slight hardship as a remote position was simply a standard position as many others in the Hospital.**

32.     Defendant is arguing here that Ms. Grimes' position, while employed, which was a remote position even before the Pandemic, Grimes Decl, ¶ 10, but which was the most logical "reasonable accommodation" available for her and that would have resulted in no additional burden on Defendant suddenly became a burden in November 2021. Now, in light of *Groff*, how does this somehow constitute a **substantial burden?** While this should be a joke, we could do a quick run-through of the evolution of the remote position.

iii.   **Ms. Grimes Position (Quality Management Specialist) Pre-Pandemic, During the Pandemic, Post Termination & Post-Pandemic.**

33.   Before the Pandemic, Ms. Grimes worked remotely 5 days a week for the Defendant in her position. Even pre-Pandemic, Ms. Grimes only attended an in-person meeting once per month.

34.   During the Pandemic, Ms. Grimes was permitted to work remotely daily without the need to come on-site for in-person meetings during the pandemic. It wasn't until October 29, 2021 (Compl. ¶ 49) that Defendant began to employ non-vaccinated employee weekly testing. Thus, the "*reasonable accommodation*" for Ms. Grimes was weekly COVID testing[2]. See Grimes Decl ¶ 42.

35.   Defendant did not require an "in person" meeting until Summer 2022, a year after Plaintiff's termination, and even then, it is our understanding that this was only for an employee seeking "recertification." To date, the position of Quality Management Specialist is still a remote-only position with no in-person requirement. Grimes Decl. ¶ 10, ¶ 18.

36.   Based on the facts in the file, it is clear (a) Ms. Grimes was already in a remote position before the pandemic, (b) she continued to function normally in a remote position during the pandemic, but before October 2021, (c) her accommodation of weekly testing was sufficient and caused no hardship, and (d) to date, her position continues to be remote. Grimes Decl. ¶ 49.

37.   Defendant's position, as was told to Ms. Grimes on November 26, 2021, that permitting Ms. Grimes to continue to work remotely would constitute an "*undue hardship*" for the hospital. Compl. ¶ 58. See **Exhibit I**. This was bogus back then and continues to be bogus now, as the position continues to be remote—with rumors that it may be ultimately outsourced altogether. Grimes Decl. ¶ 18.

## THE DEFENDANT'S FAILURE TO ENGAGE IN AN INTERACTIVE PROCESS

a.   **At No Point In Time Did Defendant Engage In A Case-by-Case Determination of Available Accommodations Or Show A Substantial Hardship.**

---

[2] Note that during this time, according to Fitch Ratings, Defendant had an existing operating revenue of approximately $9.1 billion in 2020, with a multiyear capital plan for $3.9 billion

38.     The determination of whether a particular proposed accommodation imposes an undue hardship "must be made by considering the particular factual context of each case." See *Tooley v. Martin-Marietta Corp.*, 648 F.2d 1239 (1981). Relevant factors may include, but are not limited to, the type of workplace, the nature of the employee's duties, the identifiable cost of the accommodation in relation to the size and operating costs of the employer, and the number of employees who will, in fact, need a particular accommodation. *Commission Guidelines*, 29 C.F.R. § 1605.2(e).

39.     Even under the old standard, to prove undue hardship, a Defendant was required to demonstrate how much cost or disruption the employee's proposed accommodation would involve. *Beadle v. Tampa*, 42 F.3d 633 (1995).

40.     Certainly, as far as financial costs, *Groff* taught us that it would not be enough for an employer to conclude that forcing other employees to work overtime, or the extra fees incurred with salary, would constitute an undue hardship and the consideration of other options, such as voluntary shift swapping, and alternatives, would also be necessary for this test. See also *Adeyeye v. Heartland Sweeteners, LLC*, 721 F. 3d 444 (2013).

41.     Additionally, **and contrary to the hypothetical fear-mongering by the Hospital** about losing its license, **<u>courts are clear that an employer cannot rely on hypothetical hardship when faced with an employee's religious obligation that conflicts with work but rather should rely on objective information</u>**. *Tabura v. Kellogg USA*, 880 F.3d 544 (2018). A mere assumption that many more people with the same religious practices as the individual being accommodated may seek accommodations, or hypothetical fines or costs, is not evidence of undue hardship.

42.     To establish undue hardship, thanks to *Groff,* the employer must demonstrate that the accommodation would require the employer to suffer a **substantial hardship**. Even under the old standard, the Factors to be considered would have included "the identifiable cost in relation to the size and operating costs of the employer, and the number of individuals who will, in fact, need a particular accommodation," etc. See *Commission Guidelines*, 29 C.F.R. § 1605.2(e)(1).

43.      These "costs" include not only direct monetary costs but also the burden on the conduct of the employer's business. While the EEOC will ultimately have to determine if the new test for Title VII is the same as the test for the ADA as a result of *Groff*, even under the old standard, Defendant has woefully disregarded its obligations to engage in a case-by-case analysis, inquiry into, and systematic review of the substantial hardship suffered, which is a key part of the Defendant's due diligence.

44.      Finally, no one was asking Defendant to "*create a new, fully remote position for Plaintiff*." **Plaintiff was already in one, and the remote position continues to be available to this day**. All that was asked of Defendant was to stop its invidious discrimination based on religion and disability and engage in the interactive process to determine the best accommodation for Plaintiff. Unfortunately, while it couldn't do that, all Defendant did was stonewall and terminate.

**b.   The Amended Complaint Readily Achieves The Plausible Standard, and Defendant Failed To Engage In The Interactive Process. Thus, the Defendant's Attempt To Confuse Is Pointless.**

45.      In the Motion, at § I(D), then again at § II(B), we see the systemic confusion offered by Defendant even in light of *Groff's* harmonizing effect between the standards of Title VII and those of ADA. The attempt to confuse the facts and issues is designed to make this Court believe that (a) Ms. Susan Karp's comments on November 30, 2021, specifically telling Plaintiff that both her timeline to submit a medical accommodation expired while, at the same time, asking Plaintiff to disclose confidential medical information over an unsecured email, were somehow proper and met the standard required to exchange and disclose medical information, and (b) there was an actual interactive dialogue between Ms. Grimes and the Hospital. However, there never was interactive dialogue since the Hospital mistreated this request.

46.      To ensure no confusion occurs, there needs to be clarification here since Defendant is confusing issues, hoping that the overlap would create confusion and cause the reader to miss its tremendous failure.

47.      First, regarding the failure to engage in the interactive process, Plaintiff limited these to the Claims alleging discrimination based on Disability. Furthermore, particularly after *Groff*, the Supreme Court has harmonized the standard analysis, as required by Title VII and the ADA. As such, any bifurcation

would be simply unnecessary. Regardless, Defendant cannot get away with its failure to engage in an interactive process.

48.     Second, a Court need not simply reject an independent cause of action for a failure to engage in the interactive process. Certainly, under the ADA, see 42 USC § 12101 et seq., when an employee proposes a reasonable accommodation, the employer has a duty to engage in an interactive process to identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations. Failure to engage in the interactive process can constitute an independent violation of the ADA at this point (see *Hurst v. The Lilly Co.,* 2017 U.S. Dist. LEXIS 184906 (2017). A failure to engage in the interactive process may be considered an independent violation of the ADA, specifically if the plaintiff establishes a prima facie claim showing that he/she proposed a reasonable accommodation. See *Hurst*.

49.     Alternatively, it need not be affirmatively pled as an independent ADA cause of action to bring the issue before the jury. Rather, the "interactive process" is one by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated. See *Lovejoy-Wilson v. Noco Motor Fuels, Inc.,* 242 F. Supp. 2d 236 (2003).

50.     The point is, in the context of discrimination, this sort of banter does nothing to assist with the defense or prohibit a plaintiff from liberally addressing an employer's failure to engage in an interactive process. But to take a step back for a moment, **can Defendant show that there was any sort of interactive dialogue engaged with Plaintiff as it concerns her need for a medical accommodation? <u>No.</u>** There is absolutely nothing in the record showing any attempt to engage in the interactive process. All the formalities required by the Hospital do not exist here.

51.     Ms. Grimes had informed the Hospital of her disability on numerous occasions and was prohibited from moving forward. Compl. ¶ 33. The system designed for medical accommodations, VaxApp, was not even functional at the time of the request. When Ms. Grimes enquired after the system's inability to collect the information, she was advised that since her religious exemption was approved, there was no

need to seek a Medical Exemption ("MedEx"). Compl. ¶ 32. <u>Does any of this even remotely amount to what is a proper interactive dialogue</u>? The EEOC goes into an extremely detailed 76-page dialogue as to what is required for a reasonable accommodation under the ADA in the agency's guidance labeled "Enforcement *Guidance on Reasonable Accommodation and Undue Hardship under the ADA*" and annexed hereto as **Exhibit L**. It is without a doubt that Defendant completely failed to engage in any sort of interactive dialogue.

52.     Additionally, *Defendant argues that the exhibits demonstrate the Hospital had a process for reviewing Medical Exemptions* and that *Plaintiff refused to provide the information*, but this is nothing more than an equivocal fallacy. First, the discussion concerning the MedEx, originally occurred in September 2021, the time when Plaintiff was ignored. **The plaintiff provided a letter from her personal care physician, Dr. John Eck, M.D., on September 15, 2021, which was also ignored.** See **Exhibit M.** The Hospital is using the stray email of November 30, 2021, to serve as some sort of predicate. However, the <u>Plaintiff's preference to have the discussion in confidence is not unreasonable at all and, in fact, is in line with 42 U.S.C. § 12112(d)(3)(B), (d)(4)(C) (1994); 29 C.F.R. § 1630.14(b)(1)</u>. Why would she want to disclose her medical information over a public forum? Further, this is the crux of the argument. While the Hospital may have had a process for MedEx, the fact is that they did not offer this for the Plaintiff, and rather, <u>they treated her unfairly as the Hospital blocked her attempt to seek a MedEx, treating her differently and disparately based on her closely-held religious beliefs.</u>

## **DEFENDANT CANNOT REFUTE PLAINTIFF'S PRIMA FACE CASE OF ADA VIOLATIONS**

**a.  Plaintiff Need Not Establish A Prima Face Case At This Stage & Undoubtably Asserts Sufficient Plausible Facts As to Disability Discrimination Under the ADA.**

53.     Without question, the Complaint, on its face, meets all the elements of a Disability Discrimination claim under the ADA.

54.     First, the Hospital is subject to the provisions of the ADA. Second, Plaintiff suffers from an autoimmune disease, particularly psoriasis, and other autoimmune conditions ("Autoimmune Conditions"). Compl. ¶ 20. Third, it was without a doubt that she was always able to perform her job functions without

issue and without any detriment, especially because <u>there was no vaccine requirement before November</u> <u>2021</u>. Compl. ¶ 22. Fourth, as stated above, being terminated from your position is a de facto adverse employment action under the ADA. See *Hernandez v. Int'l Shoppes, LLC*, 100 F. Supp. 3d 232, 263 (2015), See *Marr v. T'S Fam. Restaurant/Penfield Fam. Rest.*, 2023 U.S. Dist. LEXIS 45500 (2023).

55.     Defendant contends that Plaintiff's ADA claims fail because the Complaint does not allege facts supporting an inference that the Hospital discriminated against her based on any alleged disability. Motion § II(A). This is not only incorrect on its face, but also, this he-said, she-said response is not proper at a pleading stage, where the plausible standard is required.

56.     To establish an inference of discrimination, Plaintiff is first required, as she does here, to present a prima facie case of discrimination by showing that (a) her employer is subject to the ADA; (b) Plaintiff has a disability within the meaning of the ADA; (c) Plaintiff could perform the essential functions of her job with or without reasonable accommodation, and (d) Plaintiff was fired or otherwise discriminated against because of her disability.

57.     When reviewing a motion to dismiss for failure to state a claim, courts first separate the factual and legal elements of the claims and accept all of the well-pleaded facts as true. See *Fowler v. UPMC Shadyside*, 578 F.3d 203 (2009). To survive a Rule 12(b)(6) motion to dismiss, the complaint must contain sufficient factual allegations to raise a plaintiff's right to relief above the speculative level so that a claim "is plausible on its face." *Id*. at 570; *Phillips v. County of Allegheny*, 515 F.3d 224 (2008).

58.     **A claim has facial plausibility when the plaintiff pleads factual content, allowing the court to draw the reasonable inference that the Defendant is liable for the alleged misconduct**. See *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). **All reasonable inferences must be made in the plaintiff's favor**. See *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300 (2010).

59.     Finally, for purposes of pleading sufficiency, a complaint need not establish a *prima facie* case to survive a motion to dismiss (citing *Swierkiewicz*, 534 U.S. at 510), rather a complaint need only allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of unlawful

discrimination." *Connelly*, 809 F.3d at 789. *Dreibelbis v. Cty. of Berks*, 438 F. Supp. 3d 304. This standard is undeniably achieved.

**b.  Plaintiff Did Not Resign From Employment, Rather Was Terminated.**

60.     More Orwellian nonsense. To force Ms. Grimes to choose between her closely-held religious convictions and her medical health, as opposed to her job and ability to feed her family, is a decision that **no one should be made to face, which translates to a violation of her rights**. Period. There should be no discussion here.

61.     Forcing Ms. Grimes, a competent adult with the basic fundamental right to refuse treatment, particularly one that presents a risk, to exercise her freedom of speech and religion, preserving her liberty and interest of bodily integrity, she has a right to protect herself from having her religious liberties infringed upon and health being put at risk. See *Fosmire v. Nicoleau*, 75 N.Y.2d 218 (1990).

62.     Protected by the law, being forced to compromise your religious beliefs and medical health suddenly is certainly a material change in the terms and conditions of employment, one of which Ms. Grimes immediately refused and engaged in the protected activity of opposing such transgressions.

63.     But for the sake of argument, if you want to argue that she voluntarily resigned, then Defendant should be found liable for her constructive discharge. A plaintiff pleads constructive discharge when an employer "intentionally creates a work atmosphere so intolerable that [the employee] is forced to quit involuntarily," rather than directly terminating the employee." See *Terry v. Ashcroft*, 336 F. 3d 128 (2003). To prove constructive discharge, the plaintiff must show and prove that (i) his/her employer discriminated against him/her to the point where a reasonable person in her position would have felt compelled to resign and (ii) he/she actually resigned." See *Stancu v. NYC Parks Dep't*, 2022 U.S. Dist. LEXIS 178024.

64.     Here, you have an employer who has (i) openly, ignorantly, and intentionally ignored the directive of the DOH Mandate to provide for a reasonable accommodation under Title VII and the ADA for the Plaintiff (**Exhibit A**), (ii) ignored the published workplace accommodations as directed by the DOH

(**Exhibit C**), and (iii) discriminated against the Plaintiff by saying they would not be accommodating her closely-held religious convictions or medical concerns, but rather, watch her compromise and ignore her closely-held religious convictions, and possibly succumb to her ailments (see the 1.9M adverse reactions in **Exhibit B**); why? Because Defendant fails to read the statute's clear text and has far too much hubris *to say, "Oh crap! We have made a mistake*!"

65.     Contrary to the facts provided, Defendant's argument that Plaintiff never informed the Hospital about any purported disability is not only insulting but, frankly, is also Defendant's attempt to ignore its legal obligations and duties under the ADA to inquire if a reasonable accommodation is needed.

66.     Defendant **acknowledges that Ms. Grimes inquired about her need for an ME and reasonable accommodation for her medical condition**, Motion § II(B), not once, twice, but multiple times. Grimes Decl. ¶¶ 33-38, 49-55. Once it is known that an employee is inquiring about a disability, the employer **must engage the employee in the interactive process to assess whether his/her disability can be reasonably accommodated**. See *Telesford v. New York City Dep't of Educ.*, 2021 U.S. Dist. LEXIS 26242 (2021).

67.     The burden is very low on employees, and the accommodation request need not be in writing or follow any specific format to constitute a request for reasonable accommodation. The ADA "is not concerned about 'formalisms about the manner of the request, but whether the employee . . . provides the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation." *Dipinto v. Westchester Cnty.*, 2020 U.S. Dist. LEXIS 193115 (2020); *Phillips v. City of New York,* 66 A.D.3d 170 (2009)

68.     Certainly, the multiple discussions even identified in the Motion should be enough to compel the employer to initiate the process and not simply just close its eyes and, instead, make up some fictitious nonsense that she suddenly quit after 19 years of service, but without issues.

69.     If Defendant was doing its job and believed that Ms. Grimes did not have a disability, it should have acted when Plaintiff raised the issue back in September 2021 and sent her to its own doctor to

confirm, as opposed to just ignoring its responsibilities. See *EEOC v. Allied Sys., Inc.,* 36 F. Supp. 2d 515 (1999).

70.     The argument about her disability not impairing her day-to-day functions was never an issue **because the day-to-day functions never included being vaccinated and risking her medical health.** Being vaccinated was never a term of condition of employment until November 2021. Plaintiff easily clears the hurdles of *Betances* since (a) she shows that she suffers from the impairment (Compl. ¶ 19); (b) she identifies the activity to be impaired; her autoimmune system, which operates as a major life activity, and (c) impairing her autoimmune system would substantially limit her major life activities, as a result of the significant fatigue, joint pain, recurring fevers, rashes, and other issues associated with the impaired autoimmune system (*id* ¶19). *See Felix v. N.Y.C. Transit Auth.*, 154 F. Supp. 2d 640 (2001).

71.     Regarding the reference to *Norman v. NYU Langone Health Sys*., 492 F. Supp. 3d 154, 165 (2020), the big difference here is that *NYU Langone Health Sys*. actually engaged in the interactive dialogue, conducted an actual review, and spent time on this. The Defendant, in this matter, did absolutely nothing and simply ignored Plaintiff's multiple requests!

   **c.   *McBride* Is Readily Distinguishable As A Reasonable Accommodation Was Readily Available, Defendant Admits To It, So Why Was There No Undue Hardship Analysis or Evaluation?**

72.     The comment in the Motion § II(D), referencing *McBride*, holds that an employer cannot be held liable for an ADA claim for failing to engage in the interactive process if no reasonable accommodation is possible and has no application here. This is not a useful case here or Defendant as (a) there was a clear, reasonable accommodation for Plaintiff - to work remotely and have weekly testing when on-site, and (b) the facts do not even suggest slightly that any sort of interactive dialogue occurred once Ms. Grimes enquired about Medical Exemption.

73.     First, *McBride* is a poor case to cite as *McBride* concerned a plaintiff who failed to demonstrate that, with the aid of at least some reasonable accommodation, the plaintiff would be capable of performing the essential functions of the position at issue. This is not the case here.

74.     In this case, in just the next paragraph where *McBride* is cited, the Motion speaks of the <u>fact</u> <u>that Ms. Grimes managed to find a reasonable accommodation that worked—working remotely and weekly</u> <u>testing before reporting in person</u>. The fact is that **a reasonable accommodation was available** and, thus, the real problem was that while the Hospital was too busy staying committed to its invidious religious discrimination, **<u>it outrightly failed to engage in the interactive process as it concerned Plaintiff's</u>** **<u>request for an ME</u>**.

75.     The fact of the matter is that there was a very clear accommodation that should have been granted to Plaintiff. <u>Ms. Grimes should have been permitted to continue to work remotely, which was the</u> <u>case before the pandemic, during the pandemic, and apparently, even post-termination, as that position</u> <u>remained remote</u>. This issue would have otherwise been avoided.

76.     Second, Defendant goes on to say in the Motion that the only accommodation permitted by the DOH Mandate <u>was a permanent, fully remote position with no contact with patients or other staff</u>. Okay, so if this is the case, why was this not even discussed? Note that this position still exists today!

77.     An employer **must** modify its policy concerning where work is **performed if such a change** **is needed as a reasonable accommodation**, **but only if such accommodation would be effective and** **not cause an undue hardship**. 29 C.F.R. § 1630.2(o)(1)(ii), (2)(ii) (1997).

78.     The 2nd Circuit has held that working from home might, in some cases, constitute a reasonable accommodation. See *Nixon-Tinkelman v. NYC Dept. of Health & Mental Hygiene*, 434 F. App'x 17, 20 (2011); *DeRosa v. Nat'l Envelope Corp.,* 595 F.3d 99, 104 (2010) (suggesting that the employer had provided a reasonable accommodation by allowing the employee to work from home);

79.     In light of the existing case law, with the new rulings of *Groff*, there was no undue hardship, and had the Hospital actually done its job, all this would have been avoided.

**d.  While The Hospital Did Not Bother With A Medical Inquiry, The Exchange They Consider An Inquiry Violates 29 CFR § 13630.14(c)(1) and 42 USC § 12112 As It Was not Handled In Accordance With The Statues And Plaintiff's Protections.**

80.     The Motion at § III (C) is really just another red herring designed to confuse and deflect. The Hospital did not engage in an interactive dialogue concerning Plaintiff's disability, and the only time the Hospital so much as inquired about her disability was on November 26, 2021 (Compl. ¶ 58), when Ms. Grimes reminded the Hospital that she had a pending ME application, but which was met with confusion by Ms. Susan Karp. (Compl. ¶ 60), where the response sought to explore the medical information of Ms. Grimes over an unsecured email channel. At the same time, the conversation began with rejection as Plaintiff was told that it was too late because the firm deadline for a medical exemption was August 6, 2021.

81.     Second, assuming arguendo that this knee-jerk response by Ms. Karp is being considered a legitimate "medical inquiry," then this was a de facto violation of 42 USC § 12112 as it completely violated 29 CFR § 1630.14(c)(1). Pursuant to 29 CFR § 1630.14(c)(1), when an employer enquires about an employee's medical condition, such information **must be collected and maintained on separate forms and in separate medical files and be treated as confidential medical record**—not simply blurted out in an email, in a knee-jerk fashion.

82.     The Defendant, in this matter, simply repeats the very rules they violate, that the documentary evidence in the file shows they have violated the rules, in a poor attempt to make it look like they were acting per the rules. The fact is that the Hospital (a) never bothered to engage in an interactive process or dialogue for any ME, and (b) when it realized that they blew it in November, it tried to make it seem like it was actually Ms. Grimes who was the reason for the lack of an accommodation.

83.     Defendant tries to play Ms. Grimes' specific accusations as merely "conclusory," but the record speaks for itself—no one at the Hospital, in reality, had any clue on how to properly handle sensitive requests for medical information—and its knee-jerk reaction was to (a) speaking about sensitive medical information in a group email, and (b) then somehow tell Plaintiff she was no longer able to seek an ME, but meanwhile someone's "disability" doesn't neither simply expire nor does the window for the request do.

84.     The ADA requires employers to treat any medical information obtained from a disability-related inquiry or medical examination (including medical information from voluntary health or wellness

programs) and any medical information voluntarily disclosed by an employee **as a confidential medical record**. Further, employers may share such information only in limited circumstances, such as with supervisors and managers, and **not with random, entry-level employees on an email chain**. See 29 CFR § 1630.14(d)(4)(i)(A)-(C).

85.     Finally, Defense Counsel tries to argue that no *actual* *medical* information was disclosed— but this is incorrect on its face because it protects the disclosure of **any information** about a person's "medical condition." See 29 CFR § 1630.14(d)(4)(i)(A)-(C). This play on linguistics looks to improperly narrow what is protected under the law. Thus, the fact is that non-supervisory employees were made aware, against Ms. Grimes' wishes, of her existing medical condition. This is, on its face, a violation of the statutory protections under the ADA.

## THE CATCH-ALL ARGUMENTS IN SEC III, IV, AND V DO NOT DEFEAT THE PLAUSIBLE PLEADING STANDARD REQUIREMENT

86.     In the Motion § III, IV, and V, Defendant introduced a "catch-all" defense concerning the invidious discrimination, hostile work environment, and retaliation to somehow defeat the liberal pleading standard of Title VII, the ADA, and the ADEA. Surely, to survive dismissal, plaintiffs must provide the grounds upon which [their] claim rests through factual allegations sufficient to raise a right to relief above the speculative level. See *Rich v. Fox News Network, LLC*, 939 F.3d 112 (2019). This is precisely what was done here, with the exorbitant amount of specificity as provided in the Verified Complaint, this Opposition, the Affidavit of Ms. Grimes, and all the other supportive documentation.

87.     Plaintiff is well beyond the required plausibility standard required to survive dismissal on a Rule 12(b)(6) motion, and this Court must accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the nonmoving party. See *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104 (2008).

88.     Further, as the District Court may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference ... and documents possessed by or known to the plaintiff and upon which [she] relied in bringing the suit in addition to the Verified Complaint

and exhibits—there is no possible way vague statements and catchalls defeat a well-pled Complaint. See *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd*., 493 F.3d 87, 98 (2007).

89.     There are no minor or occasional acts, but rather, months of documentary evidence of Defendant's discriminatory animus against those with closely-held religious convictions and those with disabilities.

90.     The comment about the Hospital's "*attempts to accommodate*" is yet another misstatement of the law. The law demands more than just an "attempt" to accommodate. Here, the Hospital was and is **required** to provide a reasonable accommodation to qualified individuals with disabilities [See 42 U.S.C. § 12112(a), (b)(5)(A)] or for those with closely-held religious convictions, see *Groff*, unless there is an undue hardship asserted, which has now been finally harmonized for disabilities and religious convictions. The Hospital isn't required to merely attempt, but rather, **must** accommodate so long as the accommodation doesn't cause an undue hardship.

91.     Unfortunately for the Hospital, misinterpreting legal requirements is a common thing—whether it be its lackadaisical attempt to accommodate the Plaintiff's right to a religious accommodation, its non-existent attempt to provide accommodations based on employees' disabilities, or simply misreading 10 NYCRR § 2.61 to prohibit Title VII reasonable accommodations grounded in closely-held religious beliefs. Nonetheless, the one thing Defendant does get right is its complete and utter disregard for its employees' right to religious integrity, spirituality, and closely-held religious beliefs.

92.     The same application allies with its catch-all opposition to retaliation, and while this has been stated ad nauseum, in deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court must liberally construe all claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. This same standard goes for retaliation, harassment, and discrimination. See *Regan v. Benchmark Co. LLC*, 2012 U.S. Dist. LEXIS 28722 (2012).

93.     As stated throughout this Opposition, an "adverse employment action" is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly

different responsibilities, or a decision causing a significant change in benefits." *Benardo*, 2011 U.S. Dist. LEXIS 67749, 2011 WL 2565489 (2011).

94.     Defendant's claim that the Hospital falls out of the standard because any potential adverse employment action suffered by Plaintiff was non-discriminatory in nature and predicated on compliance with the DOH Mandate, Motion p. 10, is utterly wrong and misplaced. The DOH mandate specifically permitted Title VII accommodations; thus, unfortunately, this is not a proper defense.

95.     But alas, Defendant also ignores other factual allegations set forth in Plaintiff's complaint- it's not just the DOH Mandate that was misinterpreted and misapplied. The fact is that only those who alleged to have closely-held religious convictions were targeted, denied true accommodation, and told that the desired accommodation was simply foreclosed for no reason as of November 2021.

96.     Furthermore, the fact that there wasn't even a slight hint at a discussion regarding Plaintiff's medical necessity in September 2021 is completely unacceptable, and the Hospital should know better than this. This is not the Defendant's first time on the receiving end of litigation, so it should have had a system in place to prevent this.

97.     Finally, with respect to any age-related claims, Plaintiff alleges that she was more experienced and more senior than her replacements, both under 40 years old, who commanded a lesser salary and benefits package. Plaintiff's allegations regarding her replacements, while they may be sparse, create a plausible inference that the decision to promote the younger, less experienced employees over Plaintiff was motivated by age discrimination. See *Rouse v. City of New York,* 2009 U.S. Dist. LEXIS 46718 (2009) (plaintiff established a prima facie case of age discrimination under the ADEA where the plaintiff alleged that he had "more experience than at least 2 candidates" who were promoted over him). Therefore, Plaintiff's ADEA discrimination claim survives dismissal to the extent that it is premised on Defendant retaining younger employees, who are less senior, less experienced, and less compensated than Plaintiff. See *Wheeler v. Bank of N.Y. Mellon*, 2018 U.S. Dist. LEXIS 131456 (2018). Grimes Decl. ¶ 58.

**IN LIGHT OF *GROFF*, PLAINTIFF'S CLAIMS FOR EMOTIONAL DISTRESS ARE NOT SUBJECT TO DISMISSAL & ARE A QUESTION FOR THE JURY.**

98.     The Defendant's argument concludes too much at this early stage and simply suggests that the emotional distress claims do not exist because Defendant was just "enforcing the mandate." This is problematic for a variety of reasons, including (a) the DOH Mandate did not prohibit Title VII reasonable accommodations, (b) there was a reckless disregard of the Plaintiff's rights without even an attempt to engage in an interactive dialogue, particularly with her medical issues, and (c) it runs counter to the Rule 12 (b)(6) standard, where the Court should "draw all reasonable inferences in Plaintiff favor, assuming all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." See *D.W.M. v. St. Mary Sch.*, 2019 U.S. Dist. LEXIS 145583 (2019).

99.     Generally, cases that survive the strict "extreme and outrageous" requirement involve "some combination of public humiliation, false accusations of criminal or heinous conduct, verbal abuse or harassment, physical threats, permanent loss of employment, or conduct contrary to public policy." *See Stuto v. Fleishman*, 164 F.3d 820, 828 (1999); See *Ifill v. UPS*, 2005 U.S. Dist. LEXIS 5230 (2005). Here, Ms. Grimes was subjected to a complete disregard of her religious convictions, was treated aggressively with her weekly testing, and was spoken to in a condescending and insulting manner, all of which were dehumanizing since they were made publicly in front of others as if accommodating her was an inconvenience for the Defendant, to the extent of being permanently terminated as of December 1, 2021. The framework in *Ifill* is met here.

100.    Further, in light of the recent ruling in *Groff*, motivated by *Hardison*, a society that truly values religious pluralism cannot compel adherents of religions to make the cruel choice of surrendering their religion or their job." See *Jamil v. Sessions*, 2017 U.S. Dist. LEXIS 31815 (2017). Forcing someone to be needlessly deprived of their livelihood simply because they chose to follow the dictates of their conscience - forcing the Plaintiff in this matter to live in poverty as the price they must pay for worshiping her God is a true tragedy, and by its very definition, should be considered "extreme and outrageous." See *TWA v. Hardison*, 432 U.S. 63, 96-97 (1977). Whether conduct is "extreme and outrageous" is a question of fact for the jury. See *Goldenson v. Steffens*, 2014 U.S. Dist. LEXIS 201258 (2014).  Historically, when

"emotionally distressing factors" are present and coupled with a legal relationship, emotional distress becomes actionable conduct. See *Goldenson.*

101.    Whether the discriminatory conduct Ms. Grimes was subjected to rose to the level of extreme, outrageous, or atrocious conduct is not something that is simply disregarded, but rather, is a rigid analysis of the underlying facts coupled with the laws being violated. This must survive dismissal.

## <u>CONCLUSION</u>

For the reasons set forth above, the Defendant's motion to dismiss should be dismissed in its entirety, and the parties should move forward toward discovery and participate in a preliminary conference.

Respectfully submitted,

Dated:      August 4, 2023
            New York, New York

Vincent Miletti, Esq.
The Law Firm of Vincent Miletti, Esq.
10 Halletts Point, Suite 1742
Astoria, New York 11102
*NY Bar No. 5194014*
(Office) (609) 353-6287
(Fax) (609) 554-7297
(Direct) (347) 234-0034
(Email) vmiletti@milettilaw.com
*Counsel to Plaintiff Stephanie Grimes*

To:     Liza M. Velazquez
        Paul, Weiss, Rifkind, Wharton & Garrison, LLP
        1285 Avenue of the Americas
        New York, New York 10019-6064
        (212) 373-3000
        lvelazquez@paulweiss.com

        Leah J. Park
        Paul, Weiss, Rifkind, Wharton & Garrison, LLP
        1285 Avenue of the Americas
        New York, New York 10019-6064
        (212) 373-3000
        lpark@paulweiss.com

        Emily Vance
        Paul, Weiss, Rifkind, Wharton & Garrison, LLP
        1285 Avenue of the Americas

New York, New York 10019-6064
(212) 373-3000
evance@paulweiss.com